8 A.3d 209

JOYCE QUINLAN, PLAINTIFF–APPELLANT,
v. CURTISS–WRIGHT CORPORATION,
DEFENDANT–RESPONDENT.

Argued March 9, 2010—Decided December 2, 2010.

240

242

*Neil M. Mullin* argued the cause for appellant (*Smith Mullin,* attorneys, *Mr. Mullin* and *Nancy Erika Smith,* of counsel and on the briefs).

*Rosemary Alito* argued the cause for respondent (*K & L Gates,* attorneys; *Ms. Alito* and *George P. Barbatsuly,* on the briefs).

*Jerrold J. Wohlgemuth* submitted a brief on behalf of amicus curiae New Jersey Defense Association (*Porzio, Bromberg & Newman,* attorneys; *Lynne Anne Anderson* and *Vito A. Gagliardi, Jr.,* of counsel; *Mr. Wohlgemuth* and *Raquel S. Lord* on the brief).

*Claudia A. Reis* submitted a brief on behalf of amicus curiae National Employment Lawyers Association/New Jersey (*Green, Savits & Lenzo,* attorneys; *Ms. Reis, Glen D. Savits,* and *Jon W. Green,* on the brief).

*Marvin M. Goldstein* submitted a brief on behalf of amicus curiae Employers Association of New Jersey (*Proskauer Rose,*

attorneys; *Mr. Goldstein, Mark A. Saloman,* and *John J. Sarno,* of counsel and on the brief).

Justice HOENS delivered the opinion of the Court.

Plaintiff Joyce Quinlan, then the Executive Director of Human Resources for defendant Curtiss–Wright Corporation, believed that the company had discriminated against her when it promoted a man she thought was less qualified than she and made him her supervisor. In an effort to prove that her suspicions were true and that defendant was engaged in widespread sex discrimination, plaintiff gathered documents that were available to her in the ordinary course of her employment and turned copies of them over to an attorney. During discovery in her discrimination lawsuit, defendant learned that plaintiff had taken, and was continuing to take, copies of hundreds. of documents it considered to be confidential. Following disclosure of one document that was particularly helpful to plaintiff's claim that she had been discriminated against when she was not selected for the promotion, defendant fired her. The letter terminating plaintiff from her employment accused her of breach of company policies and theft. Believing that defendant had fired her because of the prosecution of her discrimination claim, plaintiff added a retaliation claim to her pending lawsuit.

After a lengthy and hard-fought trial, the jury agreed with plaintiff, awarding her substantial compensatory and punitive damages. In the appeal that followed, the verdict in her favor on the retaliation claim was reversed and remanded for a new trial and the punitive award was vacated in its entirety. The reasoning of the appellate panel that undergirds those conclusions has given rise to two disputes before this Court and although they can fairly be described as discrete issues, they are matters of great public importance, with far-reaching implications for employers and employees. The arguments raised by the parties relating to the retaliation claim are framed in terms of fundamental rights of employers and employees and each of the parties has offered

diametrically opposed views of both the rights that each enjoys and the public policy implications of any decision that this Court might reach.

Plaintiff asks this Court to read the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, broadly so that it provides complete protection for any employee who copies and takes company documents for the purpose of helping in the prosecution of a discrimination claim. She argues that because she was motivated by the need to assist in the prosecution of her lawsuit and because she disclosed the documents only to her attorneys, permitting defendant to fire her for her conduct would be contrary to the strong remedial purposes of the LAD.

Defendant insists that the employer's right to conduct its business and its right to demand loyalty of its employees is paramount. It argues that if this Court adopts the approach championed by plaintiff, the effect will be to insulate conduct that is a clear ground for termination merely because an employee had the sense to limit the disclosure of the company's confidential documents to a lawyer. Defendant cautions this Court not to create circumstances in which employees will be encouraged to rummage through employers' files hoping to find something to use as a shield against what would be an otherwise permissible termination of their employment.

Articulating the arguments raised by the parties makes plain that the issues before this Court are of great significance. The difficult task before this Court demands that we achieve a fair balance of the legitimate rights of employers and employees in circumstances in which those rights conflict. Our challenge is to create the appropriate framework against which courts may weigh and consider whether, and to what extent, an employee who finds, copies, and discloses an employer's otherwise confidential documents in the context of prosecuting a discrimination case was engaged in conduct protected by the LAD. That is a challenge we do not face in a vacuum, but one that arises in the real world of individual plaintiffs seeking to vindicate their rights and employ-

ers legitimately expecting that they will not be required to tolerate acts amounting to self-help or thievery. Today we strike the balance with the essential purposes of the LAD as our guide, but in clear recognition of those very weighty concerns.

## I.

The facts that are relevant to our consideration of this appeal were developed during the lengthy trial on the merits of plaintiff's discrimination claim. Plaintiff began her employment in 1980 as a benefits analyst in defendant's Human Resources department. Before that time, she had earned both an undergraduate degree and a master's degree in business administration, and she had gained experience working at several other companies. When she was hired by defendant, she signed an acknowledgement that defendant's official code of conduct precludes employees from using the company's confidential information for private purposes.

By 1999, plaintiff had risen through the ranks to become the Executive Director of Human Resources. Plaintiff contends that her areas of responsibility increased throughout her career and that her elevation to Executive Director was a promotion. Defendant disputed those assertions, claiming that plaintiff's work was limited to employee benefit plans, that her functions and responsibilities did not change when she became the Executive Director, and that the new title was simply a way for defendant to give her a salary increase. Notwithstanding that dispute, the parties agree that, in her role as the Executive Director of Human Resources, plaintiff reported directly to Martin Benante, who was defendant's CEO and President.

In 2000, defendant hired Kenneth Lewis to work in the Human Resources department, awarding him the title of Director of Succession Planning and Management Development. Three years later, in part because of a departmental reorganization, Lewis was promoted to Corporate Director of Human Resources and Management Development. Following that promotion and reorganization, although objectively Lewis had fewer qualifications and less

experience than plaintiff, he became her supervisor and she was required to report to him rather than to Benante. Moreover, as a result of that change, there was only one woman who reported directly to Benante, and she had been given that direct-reporting position by Benante's predecessor.

Plaintiff was disappointed when Lewis was promoted because she believed that she was in line for that job, because she thought she was better qualified than he was, and because she was greatly concerned about the small percentage of women employed by defendant. Plaintiff told Benante that she thought he had made a mistake in promoting Lewis. Benante disagreed with plaintiff's view, telling her that Lewis got the position because he had conceived of and had implemented several initiatives in the Human Resources department. He also told plaintiff that she had not been promoted because of perceived problems with her oversight of a budget for a project that had cost over-runs and because she lacked enthusiasm for her job.

Plaintiff was dissatisfied with Benante's explanation. She did not think that she was responsible for the cost over-run and she believed that Lewis was promoted because of defendant's long-standing pattern of gender discrimination. In particular, at trial she presented evidence that few women held senior managerial positions within the company and she testified that Benante often hosted business lunches and dinners, inviting only men, even when the discussions related to her department. She contended that Benante frequently played golf with Lewis and that he had created the Succession Planning position with Lewis in mind.

Shortly after voicing her concerns to Benante, plaintiff consulted with counsel about whether she was the victim of gender discrimination. Thereafter, without her attorneys' knowledge, she also began to review files to which she had access as part of her duties in the Human Resources department. She reviewed the files to look for and copy materials that she thought would show that defendant engaged in a pattern of widespread gender discrimination. Eventually, she compiled more than 1800 pages of

documents, some of which contained employees' confidential personal information, including Social Security numbers and salary information, and she delivered copies of the documents to her attorneys.

In November 2003, plaintiff filed a four-count complaint alleging that she was the victim of gender discrimination based on the failure to promote her, that defendant engaged in a pattern and practice of gender discrimination, and that defendant discriminated against her in wages and salary. During discovery, in response to defendant's notice to produce, *see R.* 4:18–1, plaintiff's attorneys delivered to defendant copies of the 1800 pages of records that plaintiff had copied from the company's files. According to defendant's trial counsel and its in-house counsel, Paul Ferdenzi, that document production marked the first time defendant became aware that plaintiff had copied confidential personnel files.

Several weeks after the document production, plaintiff, who was still employed by defendant, was given another document in her capacity as the Executive Director of Human Resources. That document was Benante's appraisal of Lewis's performance, for the period ending in April 2004, in the job plaintiff believed should have been hers. Because Benante had rated Lewis as needing improvement in several areas, plaintiff believed the appraisal was important to her claim. She therefore copied it and turned it over to her attorneys. Soon thereafter, plaintiff's attorneys deposed Lewis. During the deposition, plaintiff's counsel asked Lewis about his most recent performance evaluation and showed him a copy of the appraisal that had just been received from plaintiff. Lewis claimed that he had never seen the appraisal before, and defense counsel objected to its use at the deposition, arguing that the document had been obtained improperly by plaintiff.

Ferdenzi, who was present during the deposition, informed his superiors about what had happened during the deposition and told them that plaintiff was continuing to copy confidential material. Shortly thereafter, in June 2004, plaintiff was terminated. An

explanatory letter advised her of the reason for her termination: "Without authorization, you have removed confidential, and in some instances privileged, information.... This unauthorized taking of confidential or privileged information from the Corporation constitutes a theft of Company property...." According to plaintiff, Ferdenzi told her "that the discussion of [her] termination ... was in reference to having [the appraisal] at the Lewis deposition." After she was terminated, plaintiff amended her complaint to add a count for retaliation.

## A.

This dispute was the subject of two jury trials, the first of which ended in a mistrial when the jury was unable to reach a verdict, and the second of which resulted in a substantial verdict in plaintiff's favor. Both trials were lengthy and hard fought, but because the only issues before this Court are discrete questions about the claims for retaliation and punitive damages, we limit our recitation accordingly.

The retaliation claim was the focus of proceedings before the trial court in connection with both jury trials as the parties debated the permissible uses of the documents plaintiff had copied and turned over to her lawyers. In the end, the dispute was addressed in two parts, with arguments directed separately to the 1800 documents and the Lewis appraisal. The trial court consistently ruled that plaintiff's conduct as it related to taking and copying the 1800 documents was not protected activity and that defendant was permitted to terminate her for that conduct. That conclusion was based in part on the court's finding that plaintiff's acts of taking and copying the documents violated defendant's policy on confidentiality, a policy that the court presumed was valid.

The court had a somewhat different analysis of the Lewis appraisal, which had engendered very different arguments by the parties. That dispute began when defendant moved to dismiss the retaliation claim in its entirety, initially by advancing an argument

similar to the one raised in connection with the 1800 documents. Defendant argued that plaintiff's taking and copying of the appraisal was not protected activity and that because it was plaintiff's core evidence on the retaliation claim, permitting that claim to proceed would be the equivalent of transforming her conduct into protected activity. Plaintiff responded by arguing that defendant did not in fact terminate her for the unprotected conduct of taking the appraisal, but instead for her attorney's use of that document during the Lewis deposition. She reasoned that because her attorneys, in prosecuting her claim, engaged in protected activity when they used the appraisal, defendant could not terminate her for their act. Because of the timing of the termination, she contended that there was ample evidence on which the jury could conclude that her termination was in retaliation for what her attorneys did, rather than for any unprotected act of hers.

Defendant responded, arguing that notwithstanding the timing, its decision to terminate plaintiff was not based on her lawyer's use of the appraisal at the deposition. Instead, defendant explained that it was not until the lawyer used the appraisal at the deposition that it realized that plaintiff was still taking documents, an unprotected act for which she could be fired. Further, defendant argued that the court could not permit the attorneys' actions to insulate plaintiff from the consequence of her unprotected act. Finally, defendant asserted that even if the attorneys intended to engage in protected activity, because their use of the appraisal during the Lewis deposition was disruptive, it lost the protection it would otherwise have enjoyed.

The trial court divided its analysis into several parts. As with its decision about the 1800 documents, the court concluded that taking and copying the Lewis appraisal was not protected activity and that if the jury agreed with defendant that plaintiff was terminated because defendant learned at the deposition that she was continuing to engage in unprotected activity, her retaliation claim would fail. Notwithstanding that conclusion, the court had a different analysis of the attorneys' use of the appraisal during the

Lewis deposition. After finding that the attorneys' use of the document was itself protected and rejecting the argument that it was disruptive, the court concluded that plaintiff could prevail on her retaliation claim if the jury believed that she was fired because of what the attorneys did, rather than because she continued to take and copy documents.

The court therefore found that for purposes of the retaliation claim, there was a significant difference between the taking of the document, which was not protected activity, and its use at the deposition, which was protected activity, because defendant could fire plaintiff for the former but not for the latter. In charging the jury, the court attempted to make that distinction clear:

[W]hile Joyce Quinlan's conduct in copying and removing copies of documents is not protected and is conduct for which she could have been justifiably terminated, the conduct of her attorneys in using those documents in the process of prosecuting this lawsuit is protected activity and could not properly have been a determinative factor in terminating her. In other words, if you find that a determinative factor in Curtiss–Wright's decision to terminate Joyce Quinlan was her attorneys' use of any of the documents, including but not limited to [Mr. Lewis's performance appraisal], such a finding would be the basis of finding for Joyce Quinlan. On the other hand, if the real reason for her termination was her copying and removing the documents, including but not limited to [the performance appraisal], such a motive by Curtiss–Wright would not be actionable.

The parties fully presented their competing theories about the reasons for plaintiff's termination to the jury, each focusing on the taking and the use of the Lewis appraisal as it bore on defendant's decision to fire her. The verdict sheet submitted to the jury included a separate question directed to the retaliation claim that asked the jury whether plaintiff had proven that defendant "intentionally retaliated against her for prosecuting a lawsuit initiated in November 2003 when it terminated her employment."

The jury returned a verdict in plaintiff's favor which in part awarded her back pay and front pay, in the amounts of $475,892 and $3,650,318 respectively, on the retaliation claim.[1] After fur-

---

[1] The jury awarded plaintiff a total compensatory damage verdict of $4,565,479; in addition to the retaliation verdict, it was comprised of compensatory damages for failure to promote her and emotional distress damages.

ther presentation of evidence and argument in a bifurcated pro-
ceeding, the jury concluded, "by clear and convincing evidence,
that [defendant's] conduct in intentionally discriminating against
[plaintiff] or in intentionally retaliating against her for prosecuting
a lawsuit was especially egregious." The jury then awarded
plaintiff $4,565,479 in punitive damages. In post-verdict proceed-
ings, the trial court added prejudgment interest, counsel fees and
costs to the verdict and entered judgment accordingly.[2]

After the verdict was announced, defendant moved for a new
trial or, in the alternative, judgment notwithstanding the verdict
on retaliation and punitive damages. The trial court addressed all
of the arguments raised in those motions in a comprehensive
written opinion. In rejecting the challenge to the retaliation
verdict, the court held fast to the line it had drawn between
plaintiff's copying of the documents, which was not protected
activity, and her attorneys' use of the Lewis appraisal during the
deposition. In part, the trial court relied on federal precedent, see
Kempcke v. Monsanto Co., 132 F.3d 442 (8th Cir.1998), pointing
out that because plaintiff was given the appraisal in the ordinary
course of her work, she was not precluded from using it. More-
over, the court reiterated its conclusion that even if plaintiff should
not have copied that document, she could not be faulted for an
attorney's independent choice to use it during the deposition.
Finally, the court reasoned that because the Lewis appraisal
would and should have been produced during discovery, its use
could not be prohibited.

The trial court also rejected defendant's argument that the
evidence in the record fell short of the level of egregiousness
required to support a punitive damage award. After considering

---

[2] Although the total amount of the judgment was $10,649,117.49, that amount
included the trial court's award of $75,000 to compensate plaintiff for negative
tax consequences she would experience as a result of the verdict award. That
sum was vacated on appeal and plaintiff has not asserted that it should be
reinstated.

the applicable precedents and reviewing the evidence, the trial court concluded that the evidence was sufficient, commenting:

> In this context the reprehensibility of Curtiss–Wright's conduct is clear based upon what a reasonable jury could have found, and apparently did. Instead of trying to promote those few women who have persevered to rise close to the top, Benante brought in an outsider, Lewis, a male, who had arguably less experience than Quinlan. Benante then schemed to promote him over her without her knowledge. He claimed that he did consider her for the promotion but never discussed it with her nor let her even apply. After engaging in what the jury found was intentional discrimination, Curtiss–Wright tried to cover it up with phony excuses about why it did not promote Quinlan. When she complained about the discrimination, Curtiss–Wright used the first opportunity they thought they could get away with to fire her. Keep in mind that the perpetrator of this outrage was not some division manager or supervisor over whom a large corporate entity like Curtiss–Wright may have only limited control. This outrage was perpetrated by the CEO, who then required its experienced and well-staffed corporate counsel to effectuate the discrimination.

In short, the court found that there was an ample basis for the jury to conclude that defendant had covered up its discrimination both before and during trial, that it terminated plaintiff, a long-time employee, with no intermediate discipline, and that it used the terms "theft" and "breach of trust" in her termination letter in an effort to conceal its true motivation for her dismissal. The court also found that a reasonable jury could have concluded that defendant's asserted reasons for declining to promote plaintiff were merely a pretext used to mask discrimination.

## B.

Defendant appealed,[3] reiterating its arguments that the jury's verdict on the retaliation claim and the award for punitive damages should be overturned. In a published opinion, the Appellate Division found merit in those points, reversing and remanding the retaliation verdict for a new trial and vacating the punitive dam-

---

[3] Defendant raised numerous arguments in its appeal. In its published decision, the Appellate Division addressed all of them, agreeing with some but not others. Because plaintiff's petition for certification challenged only the panel's judgment on the retaliation and punitive damage aspects of the verdict, we need not consider defendant's other appellate arguments.

ages award in its entirety. *Quinlan v. Curtiss–Wright Corp.*, 409 *N.J.Super.* 193, 210–11, 215–17, 976 *A.2d* 429 (App.Div.2009).

On the retaliation claim, the panel agreed with defendant that the trial court erred in drawing a distinction between plaintiff's taking of the Lewis appraisal and her attorney's use of that document during the deposition. The Appellate Division began its analysis by observing that not all activities taken by employees in furtherance of a claim of discrimination are protected, *id.* at 205, 976 *A.2d* 429 (citing *Carmona v. Resorts Int'l Hotel, Inc.*, 189 *N.J.* 354, 373, 915 *A.2d* 518 (2007)), and that no New Jersey decision has considered whether taking confidential documents from an employer is a protected activity, *id.* at 205 & n. 3, 976 *A.2d* 429.

In seeking guidance about whether such activity is protected, the panel looked to federal cases, considering several published and unpublished decisions in its analysis. *See id.* at 205–08, 976 *A.2d* 429. The panel's review included *Kempcke, supra,* on which the trial court had relied, as well as two [4] other decisions that the panel found to be relevant, *see Niswander v. Cincinnati Ins. Co.,* 529 *F.*3d 714, 717 (6th Cir.2008); *O'Day v. McDonnell Douglas Helicopter Co.,* 79 *F.*3d 756, 763 (9th Cir.1996).

The Appellate Division first identified the factors that each court found to be relevant, noting that the varying fact patterns had led to different outcomes. The panel explained that the court in *Kempcke, supra,* relied on two factors, innocent acquisition and dissemination only to counsel, in concluding that the employee's activity was protected. The panel observed that the court in *O'Day, supra,* focused on the serious breach of trust represented by rummaging through a supervisor's desk and the dissemination of the documents to a co-worker in concluding that the activity was not protected. Finally, the panel noted that the court in *Niswander, supra,* identified six factors to be considered, but that

---

[4] Although the Appellate Division cited and considered a third decision, *see id.* at 206, 976 *A.2d* 429, it is an unpublished opinion to which our rules accord no precedential weight. *See R.* 1:36–3.

it had concluded that the employee's affirmative search for documents tipped the balance against finding that her activities were protected. *See Quinlan, supra,* 409 *N.J.Super.* at 207–08, 976 *A.*2d 429.

Based on its consideration of those precedents, the Appellate Division rejected the line drawn by the trial court between plaintiff's act of obtaining and copying the documents and her attorneys' use of them during the Lewis deposition. The court reasoned that such a distinction would "transform an unprotected action, copying confidential items, into a protected action on the basis of subsequent use of the confidential material." *Id.* at 208, 976 *A.*2d 429. The court expressed its concern that adopting the trial court's approach would encourage "employees to go through their employers' files and copy confidential material, secure in the knowledge that employers could do nothing so long as that material was later used in litigation." *Id.* at 208–09, 976 *A.*2d 429. In reaching its conclusion, the court specifically rejected the trial court's reliance on *Kempcke,* commenting that the decision was not only distinguishable, but unwise. Instead, the Appellate Division quoted the *Kempcke* dissent with approval, noting "that the decision 'not only opens up another avenue of on-the-job mischief but puts employers in a position where they can't do anything about it.' " *Id.* at 210, 976 *A.*2d 429 (quoting *Kempcke, supra,* 132 *F.*3d at 447 (Fagg, J., dissenting)). Having concluded that the trial court erred in instructing the jury on the permissible use of the Lewis performance appraisal, the Appellate Division remanded the matter for a new trial on the retaliation claim. *Id.* at 210–11, 976 *A.*2d 429.

The panel also agreed with defendant's argument that the record did not warrant submitting the claim for punitive damages to the jury. Noting that punitive damages may only be awarded under the LAD when upper management actually participates in the wrongful behavior and when that behavior is especially egregious, the panel found that there was insufficient evidence in the record to satisfy the latter requirement. *Id.* at 215–17, 976 *A.*2d

429 (citing *Rendine v. Pantzer*, 141 *N.J.* 292, 313–14, 661 *A.*2d 1202 (1995)).

First, the panel observed that even after plaintiff filed her lawsuit, and even after defendant realized she had taken the 1800 documents, it had permitted her to remain in her position and had given her both a bonus and a raise. *Id.* at 216, 976 *A.*2d 429. Second, the panel found nothing egregious in the wording of the termination letter, including its use of the word "theft" and its reference to plaintiff's breach of her duty to her employer. *Id.* at 217, 976 *A.*2d 429. Finding that the evidence of egregiousness was inadequate, the panel vacated the punitive award and directed entry of judgment in defendant's favor on that claim. *Ibid.*

Plaintiff petitioned for certification,[5] asking this Court to overturn both the reversal of the retaliation verdict and the order vacating the punitive damage award. We granted plaintiff's petition, 200 *N.J.* 504, 983 *A.*2d 1111 (2009), and we thereafter permitted the New Jersey Defense Association, the National Employment Lawyers Association and the Employers Association of New Jersey to participate in this matter as amici curiae.

## II.

Because the parties largely restate the arguments that they made before the trial and appellate courts, all of them can be summarized briefly. Plaintiff asserts that the Appellate Division erred in ruling that employees may be fired when they acquire company information in the normal course of their employment and share it with their attorneys in pursuing discrimination claims. She argues that the panel misapplied the federal precedents it considered and warns that the holding, if allowed to stand, will eviscerate the LAD's anti-retaliation protection by discouraging employees from taking action in opposition to discrimination. She

[5] Defendant did not file a cross-petition and therefore has not challenged any of the other aspects of the verdict or the appellate panel's decision that were adverse to its interests.

urges this Court to reinstate the jury's verdict that defendant engaged in unlawful retaliation when it fired her.

Plaintiff also seeks the reinstatement of the punitive damages award. In support of that relief, she argues that the panel erred by failing to analyze the extensive evidence she presented to the jury to show that defendant's executives engaged in egregious misconduct, including behavior designed to conceal their decision to retaliate against her. She argues that the Appellate Division erred by reciting only the limited evidence that defendant contended was relevant to its promotion and termination decisions, and by ignoring the strong evidence that led the jury to impose a punitive award. She asks this Court to agree that the evidence of egregiousness was sufficient and to reinstate the jury's punitive award.

Defendant urges us to affirm the Appellate Division's judgment. Concerning the retaliation claim, defendant argues that the panel correctly held that neither plaintiff's copying of confidential documents nor her attorneys' use of the Lewis appraisal during the deposition was protected activity under the LAD. Relying on state and federal precedents, defendant argues that a contrary decision "would encourage employees to go through their employers' files and copy confidential material in the hopes of finding at least one arguably relevant document that they might later use in litigation."

Defendant also argues that the appellate panel's rejection of plaintiff's punitive damages award is consistent with decisions of this Court limiting such awards under the LAD to especially egregious cases. Arguing that the panel correctly analyzed the evidence in the trial record in finding that it fell short of egregiousness, defendant urges us to agree that a punitive award is barred as a matter of law.

Amicus New Jersey Defense Association, in support of defendant, argues that plaintiff owed her employer a duty of loyalty that required her to preserve the confidentiality of the records entrusted to her and violated her position of trust by taking

documents. It urges this Court to reject any rule that would protect litigants who engage in self-help discovery by copying and disclosing an employer's confidential records, even if they do so only to assist their counsel in LAD litigation.

Amicus Employers Association of New Jersey, also supporting defendant, asserts that plaintiff violated both her common law duty of loyalty and four core principles of her profession's Code of Ethics. Asserting that Human Resources professionals owe a higher duty of confidence and trust to their employers than do other employees, it urges this Court to conclude that plaintiff's actions were not protected by the LAD.

Amicus National Employment Lawyers Association disagrees, raising three points in support of plaintiff's position. First, it argues that providing assistance to counsel during the course of litigation, including the disclosure of confidential documents, constitutes protected conduct under the LAD. Second, it asserts that the anti-retaliation provisions of the LAD should protect employees who disclose confidential company information if they legitimately had access to the information, if they reasonably believed it was relevant to their discrimination claim, and if the disclosure is limited to their attorneys. Third, it contends that employees' ability to obtain qualified counsel and to assist counsel in the prosecution of employment discrimination cases will be undermined if they are prevented from giving counsel confidential company information relevant to claims of unlawful employment practices.

## III.

Because this dispute calls upon us to consider claims arising under our LAD, we begin with familiar principles. We have long recognized that the essential purpose of the LAD is the "eradication 'of the cancer of discrimination.'" *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (quoting *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988); *accord Nini v. Mercer*

*County Cmty. Coll.,* 202 *N.J.* 98, 108–09, 995 *A.*2d 1094 (2010); *Cicchetti v. Morris County Sheriff's Office,* 194 *N.J.* 563, 588, 947 *A.*2d 626 (2008); *Carmona, supra,* 189 *N.J.* at 370, 915 *A.*2d 518. We have been vigilant in interpreting the LAD in accordance with that overarching purpose, and in recognition that it is, by its terms, *see N.J.S.A.* 10:5–3, remedial legislation that was intended to be given a broad and liberal interpretation. *See Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 216, 723 *A.*2d 944 (1999) (citing *Andersen v. Exxon Co. U.S.A.,* 89 *N.J.* 483, 495, 446 *A.*2d 486 (1982)). We have "been scrupulous in [our] insistence that the Law Against Discrimination be applied to the full extent of its facial coverage." *Ibid.* (quoting *Peper v. Princeton Univ. Bd. of Trs.,* 77 *N.J.* 55, 68, 389 *A.*2d 465 (1978)).

An essential aspect of the LAD is found in its anti-retaliation section, which provides that

> it shall be . . . an unlawful discrimination:
>
> . . . .
>
> For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
>
> [*N.J.S.A.* 10:5–12(d).]

▮ Although we have not been called upon directly to interpret the meaning of the protection afforded by the anti-retaliation provision to those who "assist" in a proceeding, we have agreed with the Appellate Division's holding that it is equally broad in its intention and scope:

> It is clear then, contrary to the trial court's apparent understanding, that the protection against retaliation embodied in the LAD is broad and pervasive, and must be seen as necessarily designed to promote the integrity of the underlying antidiscrimination policies of the Act by protecting against reprisals "any person" who has sought to protect his or her own rights not to be discriminated against or who has acted to support such conduct.
>
> [*Craig v. Suburban Cablevision, Inc.,* 274 *N.J.Super.* 303, 310, 644 *A.*2d 112 (App.Div.1994), *aff'd,* 140 *N.J.* 623, 660 *A.*2d 505 (1995).]

Taken as a whole, therefore, the LAD operates not only to fight discrimination wherever it is found, but to protect those who assist in rooting it out. Although the LAD has been part of our legal landscape for decades, discrimination in the workplace has not been eliminated and individuals claiming to be its victims still turn to our courts seeking relief. Their often novel arguments require our utmost care and attention in order that we may be steadfast in our efforts to effectuate the Legislature's goal of workplace equality.

## A.

At its core, this case presents the Court with starkly opposing views on a matter of fundamental importance. It does so against the background of the very different approaches taken by the trial court and by the Appellate Division. That is, where the trial court sought to distinguish between the plaintiff's taking of the documents and her attorneys' use of those documents, the appellate panel instead found preferable a rule that prohibits both the initial taking of the documents and the use thereof by lawyers for employees who believe that they are victims of discrimination.

■ We begin by recognizing that employees have a common law duty to safeguard confidential information they have learned through their employment relationship [6] and that they are generally precluded from sharing that information with unauthorized third parties. *See Adolph Gottscho, Inc. v. Am. Marking Corp.*, 18 *N.J.* 467, 474–75, 114 *A.2d* 438 (holding that employee who disclosed trade secrets for reasons other than employer's benefit violated "long-settled equitable principles"), *cert. denied*, 350 *U.S.* 834, 76 *S.Ct.* 69, 100 *L.Ed.* 744 (1955). We have observed that as it relates to employees, the duty of loyalty arises in "contexts . . . so varied that they preclude mechanical application of abstract

---

[6] In this case, plaintiff signed an agreement as part of commencing her employment, in which she acknowledged her duty to maintain company documents in confidence. Whether or not the common law duty of loyalty applies to her, therefore, she was bound by the terms of that agreement.

rules of law." *Cameco v. Gedicke*, 157 *N.J.* 504, 516, 724 *A.*2d 783 (1999); *see Sun Dial Corp. v. Rideout*, 16 *N.J.* 252, 261–62, 108 *A.*2d 442 (1954) (breach of duty of loyalty to accept employment with competitor).

That common law duty alone does not provide the answer to the question before this Court, because the issue requires us to strike the balance between the employer's legitimate right to conduct its business, including its right to safeguard its confidential documents, and the employee's right to be free from discrimination or retaliation. The rights enjoyed by neither are absolute and achieving the appropriate balance in the context of claims made under the LAD requires particular care.

As the Appellate Division noted, no New Jersey court has previously considered the question now before us, and our LAD does not provide a clear answer either. In similar circumstances, we have often looked to federal precedents for guidance in interpreting the LAD. *See Bergen, supra,* 157 *N.J.* at 200, 723 *A.*2d 944 ("To the extent the federal standards are 'useful and fair,' they will be applied in the interest of achieving a degree of uniformity in the discrimination laws.") (quotation omitted); *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 606–07, 626 *A.*2d 445 (1993) (referring to United States Supreme Court's interpretation of Title VII in considering elements of hostile work environment claim); *Grigoletti v. Ortho Pharm. Corp.*, 118 *N.J.* 89, 97, 570 *A.*2d 903 (1990) ("In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority.").

■ Although in this matter we look to federal precedents that have directly considered the issue we now confront, we proceed with caution because there are two analytical differences between our LAD and the relevant federal statutes that bear on the reasoning used by the federal courts. First, a Title VII analysis divides protected activities into two distinct types, known as participation and opposition. *See* 42 *U.S.C.A.* § 2000e–3(a). The statute identifies activities that constitute Title VII participation,

including: (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII. *Ibid.* By contrast, Title VII opposition activity need not involve the formal process of adjudicating a discrimination claim, but encompasses utilizing informal grievance procedures, staging informal protests, and voicing one's opinions in order to bring attention to an employer's discriminatory activities. *See Armstrong v. Index Journal Co.*, 647 *F.*2d 441, 448 (4th Cir.1981).

The distinction is significant because the scope of protection for conduct comprising participation is different from that afforded to conduct that is oppositional. Activities under the participation clause are essential to the " 'machinery set up by Title VII,' " *Hashimoto v. Dalton*, 118 *F.*3d 671, 680 (9th Cir.1997) (quoting *Silver v. KCA, Inc.*, 586 *F.*2d 138, 141 (9th Cir.1978)), *cert. denied*, 523 *U.S.* 1122, 118 *S.Ct.* 1803, 140 *L.Ed.*2d 943 (1998), and are therefore vigorously protected to ensure that employees will continue to have access to all mechanisms of enforcement, *see Vasconcelos v. Meese*, 907 *F.*2d 111, 113 (9th Cir.1990) ("The purpose of section 2000e–3's participation clause is to protect the employee who utilizes the tools provided by Congress to protect his rights." (internal quotation marks omitted)).

 In evaluating whether an employee has engaged in legitimate opposition activity, courts employ a balancing test. *See Booker v. Brown & Williamson Tobacco Co.*, 879 *F.*2d 1304, 1312 (6th Cir.1989). That test seeks to "balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Hochstadt v. Worcester Found. for Experimental Biology*, 545 *F.*2d 222, 231 (1st Cir.1976). In applying that test, courts have required that the employee's conduct be reasonable in light of the circumstances, and have held that "the employer's right to run his business must be balanced against the rights of

the employee to express his grievances and promote his own welfare." *Id.* at 233.

The balancing test has been particularly important in federal courts' consideration of retaliation claims like the one before this Court. In extending the Title VII approach to claims arising under the ADEA, 29 *U.S.C.A.* § 621, the Ninth Circuit has explicitly embraced the same balancing test utilized in the Title VII context. *See O'Day, supra,* 79 *F.*3d at 763 (citing *Wrighten v. Metro. Hosps., Inc.,* 726 *F.*2d 1346, 1355 (9th Cir.1984) (quoting *Hochstadt, supra,* 545 *F.*2d at 231)). Recognizing these statutory distinctions, however, informs our analysis because many of the federal precedents turn on which sort of activity the employee was pursuing when taking documents.

Second, federal courts have also held that employees are not privileged to act in a manner that is unduly "disorderly" or "disruptive" to the employer's conduct of its business. If the employee's otherwise protected activity is unduly disruptive or disorderly, the protection will be lost. For example, the First Circuit found that an employee's behavior was unduly disruptive and therefore not protected by Title VII when, in registering her complaints that she was the victim of discrimination, she engaged in a pattern of behavior that included disrupting staff meetings, misusing telephone and secretarial services, haranguing her supervisor and inviting a newspaper reporter to look at confidential salary documents. *See Hochstadt, supra,* 545 *F.*2d at 227–28, 230–34; *see also Kempcke, supra,* 132 *F.*3d at 445–46 ("we must also consider whether that [otherwise protected] conduct was so disruptive, excessive, or 'generally inimical to [the] employer's interests … as to be beyond the protection' of" the ADEA) (quoting *Hochstadt, supra,* 545 *F.*2d at 230; citing *Jackson v. St. Joseph State Hosp.,* 840 *F.*2d 1387, 1390–91 (8th Cir.1988)). The *Hochstadt* decision may represent the extreme case, and the Ninth Circuit has cautioned that it should be narrowly construed lest legitimate activities by employees asserting civil rights be chilled. *Wrighten, supra,* 726 *F.*2d at 1355.

## B.

With those essential caveats as our guide, we turn to a review of the several decisions in which the federal courts have confronted situations similar to the one before this Court. In trying to fashion a test that will fairly balance the interests of employers and employees, courts have identified a wide variety of factors and considerations. The Appellate Division, in its published opinion, surveyed a few of them, setting forth facts and holdings that the panel then embraced or rejected. *Quinlan, supra,* 409 *N.J.Super.* at 205–08, 976 *A.*2d 429. Rather than engage in a case-by-case recitation about those, and other, federal court decisions, our effort will be focused on attempting to draw from all of them the analytical tenets that they share. In this manner, we will be able to discern the appropriate template for use in considering like questions that arise under our LAD.

Many of the federal decisions have some features in common. First, each considers how the employee came into possession of the document that was eventually disclosed, essentially evaluating how innocently the document was obtained and balancing in favor of preclusion if there is any indication of behavior inconsistent with a general notion of loyalty to the employer. The fact patterns on this factor run the full gamut of behaviors, including an employee who searched his supervisor's office after business hours looking for evidence of a pattern of discrimination, *see O'Day, supra,* 79 *F.*3d at 758; an employee who sought out and copied personnel documents, relating to other employees, to which she normally had no access, *see Jefferies v. Harris County Cmty. Action Ass'n,* 615 *F.*2d 1025, 1029 (5th Cir.1980); a secretary who noticed an employee's resignation letter on her supervisor's desk and copied it because of claims being made against that employee, *see Laughlin v. Metro. Washington Airports Auth.,* 149 *F.*3d 253, 256 (4th Cir.1998); an employee who kept copies of confidential materials irrelevant to her claim but that she considered to be useful to her as "memory aids," *see Niswander, supra,* 529 *F.*3d at 718; and an employee who stumbled on files stored on a computer

given to him for his use by his employer, *see Kempcke, supra*, 132 *F*.3d at 444. Although courts have tended to be more protective of the employees who innocently stumble on documents evidencing discrimination, it is not universally true that innocence is required. The Second Circuit, for example, found no fault with an employee who, believing that the company president was engaged in hiring discrimination based on age and sex, created a job posting memo that set forth the president's plainly discriminatory description of the ideal employee and obtained the employer's signature on the document verifying that it was accurate. *See Grant v. Hazelett Strip–Casting Corp.*, 880 *F*.2d 1564, 1566–67 (2d Cir.1989). If innocently stumbling on a document were the sine qua non of protected activity, the Second Circuit presumably would have concluded otherwise.

Second, courts generally consider, as part of their analysis, what the employee did with the document. These decisions have considered a range of fact patterns including an employee who sent confidential documents that she believed were evidence of discrimination to an outside director of the company, *see Jefferies, supra*, 615 *F*.2d at 1029; an employee who found a list of individuals targeted for dismissal that he thought was discriminatory and sent it to one of those listed, *see O'Day, supra*, 79 *F*.3d at 758; an employee who, unsolicited, sent confidential documents to a former employee who was pursuing a discrimination claim against the employer, *see Laughlin, supra*, 149 *F*.3d at 256; and, in several cases, employees who only disclosed documents to their attorneys, *see Niswander, supra*, 529 *F*.3d at 718; *Kempcke, supra*, 132 *F*.3d at 444; *Grant, supra*, 880 *F*.2d at 1566–67. Although it is generally true that disclosure limited to counsel will be protected, the court in *Niswander* found to the contrary in part because the confidential documents that the employee sent to counsel were irrelevant to her claim. *Niswander, supra*, 529 *F*.3d at 721–22.

Federal courts have also routinely considered whether the employee was engaged in participation or in opposition, in light of that traditional Title VII dichotomy. *See id.* at 722–23 (applying

balancing test for acts that were merely oppositional); *Laughlin, supra*, 149 *F*.3d at 259 (balancing test applies to oppositional acts); *Kempcke, supra*, 132 *F*.3d at 445–47 (concluding that act that was arguably oppositional was protected based on other factors in balance); *Grant, supra*, 880 *F*.2d at 1570 (finding participatory activity of employee acting in good faith to be protected); *Jefferies, supra*, 615 *F*.2d at 1036 (upholding termination in part because not all oppositional activity is protected). As part of the analysis that flows from categorizing activities as being either participation or opposition, federal courts have also considered whether the actions of the employee were unduly disruptive to the employer's business. *See Laughlin, supra*, 149 *F*.3d at 259–60 (reciting test for disruption set forth in *Hochstadt*); *Kempcke, supra*, 132 *F*.3d at 446–47 (concluding that disclosure of innocently acquired document only to attorney was not disruptive).

In addition to the foregoing, generally agreed-upon factors, federal courts have identified considerations that weigh in the balance between protected and prohibited activity in particular cases. Some courts, for example, have evaluated whether the employee either sincerely believed or objectively demonstrated that there was a risk that the evidence would be lost or destroyed, which might tip the balance in favor of protection. *See O'Day, supra*, 79 *F*.3d at 763 (employee's apparently sincere belief that he was preserving evidence outweighed by manner of taking document and extent of distribution); *Jefferies, supra*, 615 *F*.2d at 1036–37 (no evidence that document would be destroyed or that remedies for loss of document would be inadequate).

In short, the federal courts have attempted to identify, within the framework of Title VII and the ADEA, factors that should bear on the decision of whether an employee who finds, takes, copies, or even creates, documents relating to a discrimination claim, and who then discloses those documents to others, has engaged in protected or prohibited conduct. There is, however, no clear consensus among the courts about what the appropriate factors are, or about how to weigh them in comparison to the

concededly legitimate needs of the employer for protection of its confidential documents and its rights to conduct its business free of unnecessary interference.

As the Appellate Division commented, the analytical framework created by the Sixth Circuit in *Niswander* is the most comprehensive. That court identified six factors that it used to balance the rights of the employer and employee in the Title VII context. Those factors represent the court's attempt to draw together all of the relevant considerations that can be gleaned from the wider array of federal decisions. Beginning with an overall reasonableness approach, *Niswander, supra,* 529 *F.*3d at 725, the court identified them as follows: how the document was obtained; to whom it was given; the content of the document; the reason for the employee's disclosure of the document; the scope of the employer's policy on privacy of documents; and the employee's ability to preserve evidence without violating the employer's privacy policy. *Id.* at 726.

Applying those factors, the *Niswander* court concluded that, even though the employee disclosed the documents only to her attorney, she was not engaging in protected activity. It reached that conclusion because the documents were entirely unrelated to her participation in a class action suit, included privileged information about other employees, and were taken and kept by her only as memory aids. Largely focusing on the fact that the documents plaintiff chose to disclose were not relevant to the litigation in which she was involved, the court struck the balance in favor of the employer. *Id.* at 727–28. In doing so, the court concluded that it would be unreasonable to cloak her choice in the protection because it "would provide employees with near-immunity." *Id.* at 722.

## C.

The challenge we face, not entirely unlike the challenge encountered by our colleagues on the federal bench, is how best to balance the strong competing considerations when an employee

engages in acts of self-help by taking or copying documents that the employer believes to be confidential for use in LAD litigation. We do so in recognition of the differences between our LAD and the federal statutes. For example, we have not drawn a distinction between participation and opposition in interpreting the LAD, and must be careful not to elevate disruption of the employer's business, which might independently form a basis for termination, to the extent that it overshadows our strong statutory protections against discrimination. Likewise, we are reluctant to embrace a rule that permits the employer clever enough to include the word "theft" in a termination letter to thereby insulate itself from an entirely legitimate claim that the termination nonetheless has been an act of discrimination.

We begin with the observation that the *Niswander* test comes close to capturing the essential elements that must be considered in balancing the rights of employees and employers. We conclude, however, that it should be expanded in two significant ways that are embodied in the test we today adopt. First, the elements the court identified in *Niswander* must be further fleshed out to provide better guidance to our courts, which we will accomplish by incorporating additional illustrations and descriptions within the elements themselves.

Second, however, and of far greater importance, we conclude that were we to adopt the *Niswander* test, our framework would be insufficient because it would fail to take into account the overarching purposes of our LAD. In the end, the test we adopt must advance the LAD's strong remedial purposes even as it seeks to carefully balance the legitimate business interests of employers against the means and methods used by employees seeking to effectuate the LAD's goals and the obligations of the attorneys who represent them. Because the fundamental purpose of our LAD is so important to the analysis, we conclude that it must be identified as a separate analytical factor. Only by affirmatively including it may we ensure that our courts consider whether the decision that they would otherwise reach by applica-

tion of the other factors adequately advances the goals our Legislature has set forth in the LAD itself.

Our consideration therefore leads us to adopt a flexible, totality of the circumstances approach that rests on consideration of a wide variety of factors, all of which must be balanced in order to achieve the essential goals embodied in the LAD. In deciding whether an employee is privileged to take or to use documents belonging to the employer, the courts must consider all of the following factors.

First, the court should evaluate how the employee came to have possession of, or access to, the document. If the employee came upon it innocently, for example, in the ordinary course of his or her duties for the employer, this factor will generally favor the employee. In that evaluation, it will not be necessary that the employee came upon the document either inadvertently or accidentally, but it will suffice if the employee came into possession of the document in the ordinary course of his or her duties. If, however, the discovery of the document was due to the employee's intentional acts outside of his or her ordinary duties, the balance will tip in the other direction. Therefore, the employee who finds a document by rummaging through files or by snooping around in offices of supervisors or other employees will not be entitled to claim the benefit of this factor.

Second, the court should evaluate what the employee did with the document. If the employee looked at it, copied it and shared it with an attorney for the purpose of evaluating whether the employee had a viable cause of action or of assisting in the prosecution of a claim, the factor will favor the employee. On the other hand, if the employee copied the document and disseminated it to other employees not privileged to see it in the ordinary course of their duties or to others outside of the company, this factor will balance in the employer's favor.

Third, the court should evaluate the nature and content of the particular document in order to weigh the strength of the employer's interest in keeping the document confidential. If the docu-

ment is protected by privilege, in whole or in part, if it reveals a trade secret or similar proprietary business information, or if it includes personal or confidential information such as Social Security numbers or medical information about other people, whether employees or customers, the employer's interest will be strong.

Fourth, the court should also consider whether there is a clearly identified company policy on privacy or confidentiality that the employee's disclosure has violated. The evaluation of this factor should take into account considerations about whether the employer has routinely enforced that policy, and whether, in the absence of a clear policy, the employee has acted in violation of a common law duty of loyalty to the employer.

Fifth, the court should evaluate the circumstances relating to the disclosure of the document to balance its relevance against considerations about whether its use or disclosure was unduly disruptive to the employer's ordinary business. In evaluating disruptiveness, the court may consider the manner or the timing of the disclosure or use of the document. However, the focus must be on whether the use or disclosure of the document unduly disrupted the employer's business, rather than on any effect it had on individual company representatives. Thus, for example, if the document had marginal relevance to the claim of discrimination, but was intended to be used merely to cast unfair aspersions, to divert the attention of the jury, or to sensationalize the trial, this factor would weigh in the balance against the employee. On the other hand, if the document was central to the discrimination claim and merely troubling or upsetting to the employee to whom it related, the factor will more likely weigh in favor of the employee.

Sixth, the court should evaluate the strength of the employee's expressed reason for copying the document rather than, for example, simply describing it or identifying its existence to counsel so that it might be requested in discovery. In this evaluation, the court should consider whether there is evidence that demonstrates that, in the absence of the employee's act of copying the

document, there was a likelihood that the employer would not maintain it, or would have discarded it in the ordinary course of business, that it would have been destroyed, or that its authenticity would be called into doubt. As part of this evaluation the court may also consider whether the document would be critical to the case, like the true "smoking gun," such that the employee's perceived need to preserve it would be entitled to greater weight in light of the significance of the risk of its loss.

Last, but of the utmost importance, the court should evaluate how its decision in the particular case bears upon two fundamental considerations that are often in conflict in matters such as these. First, the court must be cognizant of the broad remedial purposes the Legislature has advanced through our laws against discrimination, including the LAD. Second, the court must consider the effect, if any, that either protecting the document by precluding its use or permitting it to be used will have upon the balance of legitimate rights of both employers and employees. Courts should apply the two parts of this final factor with great care, utilizing them as a supplement rather than a substitute for the multi-factor test we have created. Although in a close case, for example, the broad remedial purposes of the LAD might tip the balance, courts should be vigilant lest they err by overlooking the myriad considerations that make up the test we today announce.

In making these evaluations, the court must be mindful that both employers and employees have legitimate rights. Employers have the right to operate their businesses within the bounds of the law and legitimately expect that they will have the loyalty of their employees as they do so. Employees have the right to be free of discrimination in their employment and the right to speak out when they are subjected to treatment that they reasonably believe violates that right. Balancing all of those considerations is a difficult and important task.

In establishing this balancing test, we are mindful of the concerns of employers that only a bright line rule that prohibits any employee from ever disclosing a document in pursuit of a discrimi-

nation claim and that equally prohibits any attorney from review-ing or considering such documents provided by employees will fairly protect their interests. We are mindful that employers may fear that we have opened the floodgates by granting protected status to such conduct. We, however, do not share the concern that employers will be powerless to discipline employees who take documents when they are not privileged to do so. On the con-trary, employees may still be disciplined for that behavior and even under the best of circumstances, run the significant risk that the conduct in which they engage will not be found by a court to fall within the protection our test creates. The risk of self-help is high and the risk that a jury will reject a plaintiff's argument that he or she was fired for using the document, rather than for finding it and taking it in the first place, will serve as an important limitation upon any realization of the fears that the employers have expressed to the Court.

## D.

We need not engage in a point-by-point application of these factors to the record before us, because the focus of the dispute is narrow. In the end, the trial court concluded that the wholesale copying and removal of documents was not protected activity and that if defendant terminated plaintiff for that reason, she could not prevail. Certainly, that analysis would be the same were we to apply our multi-factor test. Plaintiff had access to all of the documents as part of her duties, but amassed most of them through systematic review of files in her department; some of the initial 1800 pages included plainly confidential information about other employees; and defendant had a reasonably clear company policy against taking the documents to which plaintiff had agreed. On the other hand, as it relates to the Lewis appraisal, plaintiff gave it only to her attorneys, it was directly relevant to her claim, she had a colorable basis to believe that the Lewis appraisal would not have been disclosed during discovery, and although the use of that document was clearly upsetting to Lewis personally, it was

not disruptive because its disclosure did not threaten the operation of the company in any way.

Perhaps most important, when considering the strong remedial purposes of the LAD, and when evaluating the impact that protecting the use of the Lewis appraisal would have in the limited context of plaintiff's employment discrimination and retaliation claim, the balance weighs heavily in favor of concluding that the conduct was protected. Applying this balancing test to the documents before the court, we find ourselves in agreement with the distinction that the trial court drew. The trial court correctly told the jury that plaintiff's act of taking the documents, including the Lewis appraisal, was not protected and that the employer was free to terminate her for doing so. In its charge, the trial court asked the jury to decide whether the employer fired her for taking the documents or for pursuing her claim that the failure to promote her was discriminatory. Our application of our balancing test compels us to conclude that the trial court's approach was the correct one. When presented with that question, the jury found for plaintiff, concluding that she was the victim of retaliatory discharge. We find no warrant to interfere with that finding.

Because we conclude that the jury charge on retaliation was not in error and that the jury's verdict for plaintiff on that count is amply supported by the evidence, we reverse that aspect of the Appellate Division's judgment and we reinstate the retaliation verdict in plaintiff's favor.

## IV.

 Plaintiff also asks this Court to reinstate the jury's punitive damages verdict. Because the parties, and the appellate panel, do not disagree on the general legal principles that guide our consideration of a punitive award, we recite them only briefly. Awards of punitive damages, as this Court has explained, serve particular purposes, which we have described as "the deterrence of egregious misconduct and the punishment of the offender." *Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 337–38,

627 *A.*2d 1081 (1993) (citing *Leimgruber v. Claridge Assocs., Ltd.,* 73 *N.J.* 450, 454, 375 *A.*2d 652 (1977)). In reviewing awards of punitive damages in employment discrimination cases, we have identified two essential prerequisites. Those requirements are that there be proof that there was "actual participation by upper management or willful indifference," and proof that the conduct was "especially egregious." *Rendine, supra,* 141 *N.J.* at 313–14, 661 *A.*2d 1202; *accord Cavuoti v. New Jersey Transit Corp.,* 161 *N.J.* 107, 113, 735 *A.*2d 548 (1999). Because there is no dispute in this matter about the fact that upper management actually participated in plaintiff's termination, the sole focus of our inquiry is whether there was sufficient evidence of especially egregious conduct to support the jury's award to plaintiff.

We have described the test for egregiousness as being satisfied if plaintiff has proven "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard for the rights of [plaintiff]." *Rendine, supra,* 141 *N.J.* at 314, 661 *A.*2d 1202 (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49–50, 477 *A.*2d 1224 (1984)). In the alternative, we have found that the evidence will suffice if it demonstrates that defendant acted with "actual malice." *Herman, supra,* 133 *N.J.* at 329, 627 *A.*2d 1081.

Although the concept of egregiousness does not lend itself to neat or precise definitions, our jury instructions on punitive damages identify several considerations that bear on the question. *See* New Jersey Model Civil Instruction § 8.61 (Punitive Damages–LAD Claims). The evidence that the Model Charge instructs the jury to consider includes the likelihood that the conduct would cause serious harm, the actor's awareness or reckless disregard of the likelihood of such harm, the actor's behavior after he or she learned that the conduct would be likely to cause harm, the duration of the wrongful conduct and the acts, if any, undertaken to conceal the wrongful conduct. *Ibid.*

This Court described in *Rendine* the kind of evidence that would suffice to support a punitive award. There, the Court

explained that the jury could have found that the defendant orchestrated a "strategy designed to facilitate [plaintiffs'] discharge without consequence to defendant," and that

> [p]laintiffs offered substantial proof not only that they had been discharged because they had become pregnant and bore children, but that defendant never had intended that they return to work after their disability leave and through his subordinates, had embarked on a course of conduct designed to mislead plaintiffs and other company employees into believing that the company's motives and intentions were honorable and lawful.
>
> [*Rendine, supra,* 141 *N.J.* at 316, 661 *A.*2d 1202.]

The Third Circuit, applying our LAD in the context of a hostile work environment claim, found that there was sufficient evidence for a punitive award because of conduct that persisted over the course of several years and that was both "highly offensive" and known to be offensive and upsetting to plaintiff. *See Gares v. Willingboro Twp.,* 90 *F.*3d 720, 733 (3d Cir.1996). These determinations are both difficult and fact-sensitive. As the United States District Court for the District of New Jersey has observed, "[u]nder New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the defendant's conduct are questions for the finder of fact." *Weiss v. Parker Hannifan Corp.,* 747 *F.Supp.* 1118, 1135 (D.N.J.1990).

 Although determinations about whether there is sufficient evidence of egregiousness to permit or to support a punitive award are necessarily fact-sensitive, our review of this record leads us to conclude that the plaintiff's evidence meets the standard that we have set. Indeed, there is much about this record that is similar to the evidence described in *Rendine.* Plaintiff's evidence included testimony from defendant's CEO Benante that he regularly conducted business during lunch and dinner meetings to which he invited only male colleagues, even when the business to be discussed included or related to plaintiff's department. Similarly, he testified that he regularly played golf only with male subordinates, and that he believed the jobs in the company, including those in Human Resources, did not "attract females." There was evidence that prior to the creation of the new position

during the company reorganization in 2003, plaintiff was equal in title to some of the men, but that Benante excluded her from decision making meetings in spite of her direct reporting role.

Moreover, there was evidence from which the jury could conclude that Lewis was objectively less qualified and less experienced than was plaintiff, that because Benante enjoyed golfing and dining with Lewis, he created a position for him, refused to consider plaintiff for it, thereby putting in place a new direct reporting position that forced plaintiff into a subordinate role. The jury could have concluded that this conduct was part of a widespread pattern and that Benante pursued it with the goal of advancing a less qualified man at the expense of a highly qualified woman with nearly a quarter-century of experience and an unblemished record of service to the company.

There is also evidence that Benante knew that plaintiff believed that his conduct was part of a larger pattern of excluding women from direct or meaningful interactions with him and that the reasons Benante gave plaintiff for choosing Lewis were part of a larger plan to discriminate against her and to conceal the discrimination. Finally, there is evidence that in terminating her, the company prevented her from ever being able to benefit from her long years of service when the company's written explanation "branded her a thief."

To be sure, as defendant and the Appellate Division pointed out, there was contrary evidence. The company did not immediately terminate plaintiff for the unprotected act of taking the documents and gave her both a raise and a bonus after Lewis was promoted. But the appropriate focus for the trial court and the Appellate Division was not whether there was contrary evidence; instead the focus should have been on whether there was too little evidence of egregiousness presented by plaintiff to get to the jury on the issue at all. *See, e.g., Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969) ("trial court is not concerned with the worth, nature or extent ... of the evidence, but only with its existence,

viewed most favorably to the party opposing the motion [for involuntary dismissal]").

Judged against that standard, although the facts recited by the appellate panel suggested that there were explanations inconsistent with egregiousness, the court erred by relying on those facts to the exclusion of the ones that plaintiff offered. In the end, the facts to which defendant has pointed, although relevant to the jury's consideration of whether it believed the behavior was egregious, did not so undercut plaintiff's evidence that we can conclude that plaintiff should have been precluded from submitting the punitive damages question to the jury as a matter of law.

V.

The judgment of the Appellate Division, that reversed the jury's verdict on the retaliation claim and remanded it for a new trial and that vacated the jury's verdict on punitive damages, is reversed.

Justice ALBIN, dissenting.

Today's ruling sends a disturbing signal to both the business community and the bar that employee theft may actually pay. In this case, during a deposition, Curtiss–Wright Corporation learned that plaintiff—who had an ongoing lawsuit against the company—was continuing to steal (photocopy) confidential documents while retaining her position of trust in the company. Curtiss–Wright discharged plaintiff for the theft of a document used during the deposition. Plaintiff alleged that her firing was an unlawful act of retaliation in violation of the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–12(d). The majority now holds that Curtiss–Wright could rightfully fire plaintiff for the wrongful taking of the documents, but could be held liable if a jury found—as it did—that the firing was for plaintiff's use of the document in the deposition. The hair-splitting distinction made by the majority—in the circumstances here—reaches a level of abstraction that defies ordinary understanding.

From this point forward, no business can safely discharge an employee who is stealing highly sensitive personnel documents even as she is suing her employer and disregarding the lawful means for securing discovery. Moreover, lawyers may think that, even after they have initiated a lawsuit, they can accept pilfered documents and benefit by using them to surprise an adversary in a deposition rather than abide by the rules of discovery.

## I.

These are the facts that lead me to dissent from the majority's holding on the retaliation claim. Plaintiff, the Executive Director of Human Resources at Curtiss–Wright, filed a civil action against her employer, claiming that the company had failed to promote her based on gender discrimination. Before filing the lawsuit, plaintiff photocopied more than 1800 confidential documents containing sensitive personal information about other employees, such as social security numbers, home addresses, and phone numbers. She delivered those documents to her attorney. After commencing her discrimination action against Curtiss–Wright, plaintiff remained in her trusted position as human resources director. Playing by the rules of discovery, plaintiff's attorney disclosed to Curtiss–Wright that he had possession of those 1800–plus, earlier-photocopied documents. Plaintiff was not fired. Indeed, after the disclosure plaintiff still received her regularly scheduled pay raise.

Nevertheless, in disregard of company policy, plaintiff did not stop copying confidential documents. Indeed, she surreptitiously copied the personal evaluation of her supervisor, Kenneth Lewis, and handed it over to her attorney even as he was requesting documents from Curtiss–Wright through the proper channels of the discovery process. Plaintiff's attorney accepted the ill-gotten document without advising Curtiss–Wright of his acquisition. Curtiss–Wright learned that the theft of documents continued during the deposition of Kenneth Lewis when plaintiff's attorney

ambushed the unwary witness.[1] At that deposition, plaintiff's attorney pulled out the purloined confidential evaluation of Lewis—an evaluation Lewis had never seen himself—and cross-examined Lewis using the document. The surprised Curtiss–Wright attorney reported back to the company that plaintiff continued to remove confidential documents without authorization.

Knowing that plaintiff persisted in using her position as a human resource director to misappropriate confidential documents in disregard of company policy, Curtiss–Wright discharged her. Plaintiff filed a retaliation claim against Curtiss–Wright under the LAD, *N.J.S.A.* 10:5–12(d). She contended, among other things, that the use of the purloined Lewis evaluation at the deposition was protected activity, that Curtiss–Wright fired her as a result of her attorney's legitimate use of the document in violation of the LAD, and that she was entitled to money damages.

The trial court charged the jury that, on the one hand, Curtiss–Wright could legitimately fire plaintiff for the wrongful taking of the confidential documents, in particular the Lewis evaluation. On the other hand, the court told the jury that if Curtiss–Wright fired plaintiff because the filched documents were used in the discrimination lawsuit, then the company engaged in wrongful retaliation in contravention of the LAD. Specifically with regard to the Lewis evaluation, the court never explained to the jury how it was to determine whether Curtiss–Wright fired plaintiff over the wrongful taking of the document as opposed to the use of the document. After all, Curtiss–Wright only learned of the taking of the document when it was used. To be clear, the jury was told that it could find that Curtiss–Wright engaged in unlawful retaliation if it concluded that plaintiff's firing was prompted by the use of the Lewis evaluation.

---

[1] Lewis was appointed to the position to which plaintiff sought promotion. Curtiss–Wright's failure to promote her to that position triggered plaintiff's gender-discrimination lawsuit.

The jury rendered a verdict against Curtiss–Wright on the discrimination and retaliation claims and awarded substantial monetary damages to plaintiff. The Appellate Division reversed and ordered a new trial on the retaliation claim. *Quinlan v. Curtiss–Wright Corp.,* 409 *N.J.Super.* 193, 211, 218, 976 *A.*2d 429 (App.Div.2009).

The appellate panel held that the illicit copying of confidential documents—a dischargeable event—was not transformed into protected activity when one of those documents was used in the Lewis deposition. *Id.* at 208, 976 *A.*2d 429. In the panel's view, the trial court's approach "could have the undesirable result of encouraging employees to go through their employers' files and copy confidential material, secure in the knowledge that employers could do nothing so long as that material was later used in litigation." *Id.* at 208–09, 976 *A.*2d 429. The trial court's flawed "metaphysical" distinction between the taking of the documents and their use in the litigation required the reversal of the retaliation verdict. *Id.* at 209–11, 976 *A.*2d 429.

## II.

A majority of this Court has now reversed the Appellate Division, blessing the jury charge that the panel found fatally flawed. I respectfully dissent because the majority's test, particularly as applied in this case, may encourage unscrupulous behavior. It also may leave a business powerless to discharge a disloyal employee—unless, of course, the business is willing to play Russian roulette with its fortunes before a jury. Moreover, the opinion sends the wrong message to the bar: lawyers should not in any way signal to a client that stealing documents is an acceptable substitute for the discovery process. Although plaintiff had the right to demand the production of documents from Curtiss–Wright, she did not have the right to bypass that process by stealing documents from her employer during the litigation.

To prove an act of unlawful retaliation under the LAD, *N.J.S.A.* 10:5–12(d), a plaintiff must prove several essential elements, in-

cluding that she engaged in a protected activity and that her participation in the protected activity caused the retaliation. *See Tartaglia v. UBS PaineWebber Inc.,* 197 *N.J.* 81, 125, 961 *A.*2d 1167 (2008). Plaintiff's taking of documents in this case was not protected activity. She abused her high-ranking position in the company to convey hundreds of pages of confidential documents—containing highly personal information about her coworkers—to her attorney, and continued to do so even after she had filed her suit. As with the other documents, the Lewis evaluation was entrusted to plaintiff as part of her job in the Human Resources Department. It is true that plaintiff was a victim of gender discrimination—a point not challenged here by Curtiss–Wright. That, however, did not give her a right to engage in untoward self-help and misconduct and then to seek shelter under the LAD's anti-retaliation provision.

I agree with the Appellate Division that the trial court's theoretical distinction between the taking of the Lewis document (unprotected activity) and the use of that document (protected activity) was not a practical one that a rational jury could make. The logic of the trial court's distinction—at least with respect to the Lewis evaluation—is that plaintiff benefited by laundering the wrongfully taken document through the deposition. In the circumstances of this case, it cannot be that the wrongful acquisition of the document is bleached clean because plaintiff's attorney surprised everyone by using it at the Lewis deposition. Moreover, because Curtiss–Wright learned of the theft of the Lewis evaluation at the deposition, the taking and the use were inextricably intertwined. How could a rational jury conclude that Curtiss–Wright fired plaintiff not because of the taking of the Lewis document, but only because of its use?

The other troubling aspect of this affair is that plaintiff's attorney accepted the illicitly taken Lewis evaluation instead of returning it to Curtiss–Wright. At the time of the receipt of that document, plaintiff's attorney had an outstanding discovery request for documents related to Lewis. Presumably, plaintiff could

have obtained the documents the old-fashioned way—through the lawful process of discovery. Then, Curtiss–Wright would have been on notice of the company's documents in plaintiff's possession. Plaintiff's attorney, however, laid in wait with the pirated document, springing the ultimate surprise at deposition. This is not conduct that our Court should be encouraging.

The right and wrong of what happened here is quite simple to me. I am not suggesting that in other circumstances, before the onset of litigation, an employee might not be justified in photocopying a document that clearly indicates that the employer was engaged in illegal conduct. Turning that document over to an appropriate authority may be classic whistle-blowing activity. I also am not suggesting that even after the initiation of litigation an employee may not have the right to preserve a document that he or she reasonably believes an employer is about to destroy or alter. A test to balance the competing interests of an employee and employer and the public good, I concede, may well be required under those circumstances. I see no need to adopt the complex test that the majority has crafted in this very straightforward case. This case calls for a narrow ruling that employers, employees, and the public will understand.

In my opinion, after filing suit, the theft of documents by an employee entrusted with personnel files is intolerable when the employee has at her disposal the machinery of our civil-discovery process and has no reason to fear that the employer will conceal or destroy relevant documents or evidence. If the theft of the documents is a lawful basis for discharge, then plaintiff should not benefit by a shield of immunity because she rushed to use the documents in a deposition.

### III.

I would affirm the judgment of the Appellate Division reversing plaintiff's verdict on the retaliation claim and remand for a new trial. Neither the illicit taking nor the exploitative use of the Lewis evaluation was protected activity under the LAD. The theft

of the document and the use at the deposition were hopelessly intertwined, and no rational distinction could be made between the two. Therefore, Curtiss–Wright had a legitimate ground to discharge plaintiff for the taking or the use of the document based on breach of trust and disloyalty. I therefore respectfully dissent.

*For reversal*—Chief Justice RABNER and Justices LONG, WALLACE, RIVERA–SOTO and HOENS—5.

*For affirmance*—Justices LaVECCHIA and ALBIN—2.