12 A.3d 239 (2011)
418 N.J. Super. 107
Judith Carrie RUSAK, Plaintiff-Appellant,
v.
RYAN AUTOMOTIVE, L.L.C. and Nilesh Kotesha, a/k/a Neil Kotesha, Defendants-Respondents.
No. A-2002-09T1.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 2010.
Decided February 8, 2011.
*240 Noel C. Crowley, Morristown, argued the cause for appellant (Crowley & Crowley, attorneys; Mr. Crowley, on the brief).
Elizabeth F. Walker argued the cause for respondents (Kennedy, Campbell, Lipski *241 & Dochney, attorneys; Ms. Walker, on the brief).
Before Judges GRAVES, MESSANO and WAUGH.
The opinion of the court was delivered by
MESSANO, J.A.D.
At trial, the jury awarded plaintiff Judith Carrie Rusak compensatory damages based upon defendants' violation of the Law Against Discrimination, N.J.S.A. 10:5-1 to -49 (the LAD). The sole issue presented on appeal is whether the trial judge erred by not submitting plaintiff's punitive damages claim to the jury. Having considered the arguments raised in light of the record and applicable legal standards, we reverse and remand the matter for a new trial limited to plaintiff's claim for punitive damages.

I.

(a)
We briefly summarize the facts adduced at trial in a light most favorable to plaintiff.[1] In August 2001, plaintiff began working as a salesperson at Gearhart BMW, an automobile dealership. She continued her employment after the dealership was acquired in 2003 by defendant, Ryan Automotive, L.L.C. (Ryan). The dealership became known as Denville BMW, and plaintiff, the only full-time female salesperson, consistently garnered awards for her work, including the "Ryan Pinnacle Award," recognizing "top sales performers" who also received near perfect scores on customer surveys. Plaintiff also typically ranked first or second in sales volume.
Upon acquiring the dealership in 2003, Ryan issued an anti-harassment and discrimination policy. Among other things, that policy included the following provision:
[H]arassment includes . . . slurs, jokes and other verbal, graphic, or physical conduct relating to an individual's race, color, sex, sexual orientation . . . [and] includes sexual advances, requests for sexual favors, unwelcome or offensive touching, and other verbal, graphic or physical conduct of a sexual nature.
The policy set forth a reporting and investigative mechanism in the event an employee believed a violation had occurred.
In April 2005, Ryan hired co-defendant Nilesh Kotecha as general manager of the dealership.[2] Kotecha believed that the "[dealership] was having a lot of problems" and that he needed "help . . . [to] get the store running." He hired a longtime friend, Cyrus Seervai. On June 11, 2005, Kotecha organized a Saturday morning meeting with the sales staff to address his concerns about employee conduct and *242 declining business. Kotecha intended to deliver a stern message.
Plaintiff believed that Kotecha's anger at the meeting was directed entirely at her. Although the two had barely spoken prior to the meeting, upon hearing a question from plaintiff, Kotecha walked to her desk, stood "very close," looked "directly at [her]" and began screaming and cursing. David Elliot, another employee who was at the meeting, witnessed Kotecha "in [plaintiff's] face" screaming at her.
After the meeting concluded, plaintiff sought out Kotecha to determine why he had admonished her. Kotecha handed her his cell phone and told her to call Ryan's owner, Rod Ryan. Kotecha claimed that Rod Ryan would not be upset at his use of foul language and would believe him, not plaintiff.
On the following Monday, plaintiff was called to the office of Michelle Danz, an office manager who had heard about Kotecha's conduct from other employees. Danz authored a memo to plaintiff's file "describing . . . things that had been told to [Danz] about the meeting." Danz also acknowledged that plaintiff wanted to "give[] two weeks notice" because she was outraged by Kotecha's conduct. Danz brought her concerns to one of Ryan's vice-presidents, "Mr[.] Forcini," and its comptroller, Kathryn Reynolds.
A few days later, Kotecha became irate with Danz over a trivial matter and followed her into her office. Kotecha told her, "don't come back, don't ever come back again," and began "shoving chairs all around, knocking one over." Believing that she was fired, Danz packed her belongings and went home, only to receive a phone call from Forcini "ask[ing] . . . [her] to come back." Concluding that she could never again work in such a "hostile environment," Danz declined the offer and warned Forcini that Kotecha had an "anger problem." She also later advised Rod Ryan that plaintiff "ha[d] a good case down the road."
Soon after Danz's departure, plaintiff received a telephone call from Lisa Cesaro, a representative from human resources who was investigating the complaints regarding Kotecha. Cesaro reassured plaintiff that she would come to the dealership herself to "talk to [plaintiff] privately." However, upon her arrival, Cesaro approached plaintiff and escorted her into a room where Kotecha was present. Cesaro and Kotecha accused plaintiff of trying to bribe Kotecha into giving her boyfriend a job at a new dealership, and scolded plaintiff for repeatedly having a "problem with attendance and punctuality." Plaintiff left the meeting "shocked" and realized that her complaints about Kotecha had "f[allen] on deaf ears."
Kotecha's insults and crude comments escalated. Plaintiff testified he would often mutter vulgarities under his breath, adding they were his "favorite" words. Kotecha would walk by plaintiff's desk and call her a "dumb . . . stupid blonde" all "within ear shot" of other employees. Once, when plaintiff was returning from the bathroom, Kotecha asked if she was menstruating.
Kotecha would often subject plaintiff and another female employee, Carolyn Noce, to explicitly graphic sexual stories about Ryan executives engaging in sexual acts with other executives' wives, claiming some would have "sex on the hood of [a] car." After calling plaintiff a derogatory name, Kotecha dared her to phone "Rod [Ryan]," boasting she would never be believed.
Noce testified that on December 31, 2005, Kotecha removed plaintiff's name from a list of salespersons used to determine who would receive annual awards *243 from the dealership. Names were usually removed from the list only if the salesperson had left employment with the dealership, and Noce knew plaintiff had not been terminated. Kotecha also removed plaintiff's "telephone and computer" after accusing her of not "want[ing] to wait on people," and plaintiff's name was removed from the internal BMW website that was used to transact sales business.
On or about February 23, 2006, Seervai showed plaintiff and Noce graphic pictures of female genitalia, leaving a copy of the pornography on plaintiff's desk. He subsequently e-mailed the pictures to plaintiff's and Noce's office and home computers. Seervai asked plaintiff and Noce "which one [was] [theirs]." Plaintiff told Kotecha outside the dealership that Seervai "had sent [her] some porn on the [I]nternet during work hours." Kotecha told plaintiff to "shut the fuck up," walked inside, and told other employees that "he was going to fire [her]."
Plaintiff did not return to work after February 25, 2006.[3] She experienced "anxiety attacks," "was under a doctor's care for quite some time," and was "taking Xanax and Prozac." Plaintiff remained unemployed until October 2007.
On February 21, 2007, plaintiff filed her complaint alleging three causes of action: a violation of the LAD in that she was discriminated against and harassed on the basis of her gender; retaliation in violation of the LAD; and the common law tort of intentional infliction of emotional distress. She sought compensatory damages for lost wages and emotional distress, as well as punitive damages and counsel fees.

(b)
At the close of plaintiff's case, defense counsel moved to dismiss the claims for intentional infliction of emotional distress and punitive damages under the LAD. She argued that plaintiff had failed to prove "extreme and outrageous conduct" by defendants and also failed to demonstrate "some treatment" for the emotional distress she allegedly suffered. As to the punitive damages claim, defense counsel argued that plaintiff had failed to prove "actual participation and a willful indifference to wrongful conduct on the part of upper management."
Noting that "some very nasty, very ugly allegations . . . ha[d] been leveled against . . . Kotecha[,]" the judge concluded that plaintiff had "prove[n] a prima facie case" of intentional infliction of emotional distress. The judge further reasoned that his ruling "bec[a]me[] the law. . . of the case . . . regarding punitive damages[,]" because of the "extreme conduct" alleged, and because the claims for intentional infliction of emotional distress and punitive damages "go[] together." He denied both motions.
Several defense witnesses testified and defense counsel again moved to dismiss the LAD claims against Kotecha individually at the end of the case. She argued that there was no evidence to support a finding that Kotecha aided or abetted Ryan's discrimination. The judge concluded there was sufficient evidence to prove Kotecha's individual liability on plaintiff's retaliation claim. He denied the motion without prejudice.
Defendants also renewed their motion to dismiss plaintiff's claim for intentional infliction of emotional distress. Noting the "overlapping claims" for emotional distress under the LAD and the common law tort, the judge concluded "[there was] a fact *244 question." He denied the motion without prejudice.
The following exchange then took place between the judge and defense counsel:
Defense counsel: [T]he other issue is a motion for a directed verdict on the punitive damage aspect of the LAD claim but, Your Honor, since you denied the intentional infliction of emotional distress I'm assuming
Judge: Of course, that goes along with it.
Defense counsel:that would go along with it.
The judge then asked both attorneys if they objected to telling the jury in the initial charge that "if they find liability they will come back and address . . . punitive damages." Plaintiff's counsel objected. Defense counsel noted, "I'm inclined to think that there's a different standard on them." The judge agreed, but renewed his inquiry as to whether the jury should be told about the possibility of a bifurcated trial on punitive damages. Defense counsel reiterated, "[M]y understanding of the purpose of bifurcation is not to confuse there [are] two standards and not to confuse the issues with regard to punitive damages. . . ." Ultimately, the judge concluded that he would not advise the jury of a possible second phase of the trial.
Because it is critical to the arguments raised on appeal, we discuss at length the jury verdict sheet reviewed by the judge and the attorneys during the charge conference, as well as the jury's responses to the questions posed.
In answer to question one, the jury concluded plaintiff was "subjected to a hostile work environment because of her gender or sex." Answering question two, the jury found that Kotecha caused "the hostile or abusive work environment." In answer to question three, the jury determined that plaintiff suffered damages "as a proximate or legal result of [the] hostile or abusive work environment." The jury further concluded, in answers to questions four and five, that plaintiff made a "good faith" complaint to Kotecha regarding Seervai's pornographic e-mail, and that her report was "a substantial or motivating factor in. . . Kotecha's decision to discharge her."
Question six asked, "Did the acts of the [d]efendants constitute such willful, wanton and reckless conduct that you find for [plaintiff] on the legal theory of intentional infliction of emotional distress as defined by the Court?" The jury answered in the negative. The jury also answered "No" to question seven, which asked, "Should [p]laintiff . . . be awarded damages to compensate for her emotional pain and mental anguish?" Finally, the jury answered question eight by awarding plaintiff $80,108.80 "to compensate for her lost wages and back pay[.]"[4]
After receiving the jury's verdict, the judge dismissed the jurors and the following exchange took place:
Judge: Obviously having found no on question six, we need not go into the punitive damages phase of the case. Am I correct?
Plaintiff's counsel: No, not correct.
Judge: I believe it is the case. They found
Counsel: T[arr against] C[iasulli].
Judge: I realize that, but I don't see the punitive damages at all. Having answered six no, it's a finding of no egregious conduct. And to me, that would be molded into a T[arr versus] C[iasulli], *245 absolutely, but not punitive damages. I don't see it in the case and the clear intent of the jury was to award compensatory damages and no punitive damages.
And that's it.
Counsel: We understand the Court's ruling.
The judge, in anticipation of further motions from defendants and the submission of plaintiff's counsel's fee request, set September 11, 2009 as a return date. He then expanded on his ruling regarding punitive damages:
The reason that I have decided that there is no basis to proceed on the second phase, exemplary damages, is not just on six, that the answer was no. It also relates to their finding that there was no emotional pain or anguish sustained by the plaintiff. There was a negative finding on that point.
That to me is quite clear in terms of what the jury was saying on these special interrogatories. If a person has no. . . emotional pain, anguish or suffering, and . . . they're exclusively limited to their economic damages . . . [c]oupled with the finding of no cause on the emotional distress, to me it is a very clear and resounding statement by the jury that they will not go to exemplary damages.
It just seems obvious to me. . . . [I]t's one of the advantages you get from special interrogatories. To me, the inference is so clear, so absolute, that [it] would be . . . improper to go with the second phase.
The judge told plaintiff's counsel, "[Y]ou can certainly make your . . . [m]otion on that."
On August 27, plaintiff moved for reconsideration of the dismissal of her punitive damage claim and oral argument took place on September 25. First, the judge concluded that the motion was untimely since it was not brought within 20 days of the verdict. See R. 4:49-1 (motion for a new trial must be brought within "20 days after the court's conclusions are announced in non-jury actions or after the return of the verdict of the jury"); R. 4:49-2 (motion for reconsideration must be made "not later than 20 days after service of the judgment or order upon all parties"). He nonetheless considered the motion on its merits.
[T]he jury awarded zero damages to the plaintiff for emotional pain and suffering and anguish. . . . It also ruled that there was no willful, wanton or reckless conduct. Willful, understand that, willful, sufficient for them to find any basis for the intentional infliction of emotional distress claim to survive.
Both of those questions were answered in the negative. . . . I remain convinced . . . that the jury disregarded and rejected the concept of intentional conduct, whether you call it malice, whether you call it willful, wanton, whether you call it whatever. The jury rejected it.
Consequently, . . . there was no basis to go forward with the phase two aspects of the case. . . . I cannot get into the minds of the jurors. But they elected to award economic damages only. And that was their discretion. . . .
[T]his particular arrangement of questions for this jury was intended to allow a bridge to [the] second phase of the trial. If the jury had answered questions six or seven yes, we would have had a second phase. They didn't.
The judge denied plaintiff's motion.[5] Final judgment incorporating the award of counsel *246 fees was entered on November 17, and this appeal followed.

II.
Plaintiff's various arguments can be distilled into one essential contention. Once the jury awarded plaintiff compensatory damages as a result of defendants' violations of the LAD, the particular conduct of defendants in this case warranted submission of her punitive damages claim to the jury.
To the extent the judge concluded punitive damages were unwarranted because the jury found, in answering question seven, that plaintiff suffered no emotional distress, defendants concede that was error, albeit harmless. However, they argue that question six was a "bridge" question designed to incorporate within its terms the requisite states of mind necessary to support any award of punitive damages. Defendants contend, therefore, that the judge properly determined that the jury's negative answer to question six meant that plaintiff had failed to prove defendants acted with "actual malice or . . . wanton and willful disregard" of potential harm so as to support any award of punitive damages. N.J.S.A. 2A:15-5.12(a).
We start with some basic principles. Our review of a trial court's ruling on punitive damages is de novo. Baker v. Natl. State Bank, 353 N.J. Super. 145, 152, 801 A.2d 1158 (App.Div.2002). "Because de novo review means that no special deference will be accorded to a trial court's findings of fact and conclusions of law, the trial court's characterization of the evidence in support of the award of punitive damages is of little significance." Id. at 153, 801 A.2d 1158.
In this case, the judge twice denied defendants' motion for dismissal of plaintiff's punitive damages claim. However, to the extent his post-verdict rulings evidenced some reconsideration of his position, we conclude that the evidence in this case supported submission of plaintiff's punitive damage claim to the jury.
The Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17 (the PDA), provides in relevant part,
Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

[N.J.S.A. 2A:15-5.12(a) (emphasis added).]
A defendant may elect to bifurcate the trial, and "[p]unitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial." N.J.S.A. 2A:15-5.13(c); see also Smith v. Whitaker, 160 N.J. 221, 245, 734 A.2d 243 (1999) (holding that "an award of *247 compensatory damages [i]s a predicate for a punitive damages award").
The Court has recently reiterated the standard of conduct that will support an award of punitive damages in LAD cases.
In reviewing awards of punitive damages in employment discrimination cases, we have identified two essential prerequisites. Those requirements are that there be proof that there was "actual participation by upper management or willful indifference," and proof that the conduct was "especially egregious."
[Quinlan, supra, 204 N.J. at 274, 8 A.3d 209 (quoting Rendine v. Pantzer, 141 N.J. 292, 313-14, 661 A.2d 1202 (1995)).]
"[T]he test for egregiousness . . . [is] satisfied if plaintiff has proven an intentional wrongdoing in the sense of an evil-minded act or an act accompanied by a wanton and willful disregard for the rights of [plaintiff]. . . . In the alternative, we have found that the evidence will suffice if it demonstrates that defendant acted with actual malice." Ibid. (citations and quotations omitted).
In this case, plaintiff's proofs demonstrated a continuous pattern of hostility directed at her because of her gender. Kotecha's comments amounted to more than boorish behavior. His conduct actually affected plaintiff's employment at the dealership. When she complained about pornographic images being sent to her by a fellow employee, Kotecha boasted that he would fire her. As general manager of the dealership, Kotecha was in an upper management position. We recognize there was proof to the contrary. However, those proofs may be "relevant to the jury's consideration of whether it believed the behavior was egregious, [but they] d[o] not so undercut plaintiff's evidence that we can conclude that plaintiff should have been precluded from submitting the punitive damages question to the jury as a matter of law." Id. at 277, 8 A.3d 209.
Our conclusion is buttressed by a review of cases in which much less egregious conduct supported submission of the issue to the jury. See, e.g., Quinlan, supra, 204 N.J. at 275-77, 8 A.3d 209 (employer's refusal to promote the plaintiff and a repeated pattern of gender discrimination evidenced sufficient egregious conduct); Lockley v. Dep't of Corr., 177 N.J. 413, 417, 828 A.2d 869 (2003) (employee's use of "vulgar terms to describe [plaintiff's] alleged sexual orientation"); Kluczyk v. Tropicana Prods. Inc., 368 N.J.Super. 479, 497, 847 A.2d 23 (App.Div.2004) (finding of "egregious conduct" supported by the defendant's "threat of retaliation" and disparate treatment of the plaintiff's complaints).
We next turn to the central issue that arose after the jury's verdict, i.e., what was the import, if any, of the jury's answers to the interrogatories on the verdict sheet. In this regard, we first consider the necessary elements of the tort of intentional infliction of emotional distress and the judge's charge to the jury in that regard.
"[I]n order to prevail on that common law claim, `the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe.'" Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 587, 969 A.2d 1097 (2009) (quoting Tarr v. Ciasulli, 181 N.J. 70, 77, 853 A.2d 921 (2004)). The elements of the tort are explained in Model Jury Charge (Civil), 3.30F, "Intentional Infliction of Emotional Distress" (1999), which the judge utilized in this case. A plaintiff must prove that "defendant acted intentionally or recklessly"; "defendant's conduct must be extreme and outrageous," that is, it must be "beyond all possible bounds of decency and to be regarded as *248 atrocious and utterly intolerable in a civilized community"; "defendant's actions must have been the proximate cause of plaintiff's emotional distress"; and "the emotional distress suffered by plaintiff must be so severe that no reasonable person could be expected to endure such distress." Ibid.
When the judge reviewed the verdict sheet with the jury during his final charge, he referred to question six and reminded the jurors that "[he] gave [them] the instruction on that subject." We note that although the verdict sheet asked whether defendants' conduct was "willful, wanton and reckless," neither "willful" nor "wanton" were ever defined for the jury in the context of the intentional infliction of emotional distress, nor should they have been, because those states of mind are not necessary elements of the tort. Instead, question six co-opted those terms from the PDA. See N.J.S.A. 2A:15-5.12(a).[6] Needless to say, the jury properly was not provided with instructions on punitive damages during the liability phase of the trial. See N.J.S.A. 2A:15-5.13(b).
To the extent the judge believed question six was a "bridge" question, an argument specifically adopted by defendants before us, we find it to be both confusing and unpersuasive. As noted, the common law tort of intentional infliction of emotional distress does not require anything more than intentional or reckless conduct by the defendant. Moreover, the record does not reflect that plaintiff ever consented to question six being a "bridge" or necessary predicate upon which her punitive damage claim rose or fell.
There is an additional reason why the judge erred in interpreting the jury's negative answer to question six as the equivalent of a factual finding under the PDA with respect to defendants' state of mind. As mentioned, the common law tort has four elements, one of which is that plaintiff prove she suffered emotional distress. The issue of whether plaintiff suffered emotional distress was hotly contested at trial. Indeed, defendants argued that other events in plaintiff's life caused whatever stress she experienced. It is reasonable to deduce that the jury answered question six in the negative because it concluded plaintiff did not suffer emotional distress as a result of defendants' discriminatory conduct. The reasonableness of that conclusion comports with the jury's answer to question seven, i.e., that plaintiff should not receive any award for emotional pain and mental anguish damages. In short, the jury's answer to question six cannot be interpreted as a factual finding that defendants did not act with the requisite mental state to support an award under the PDA.
Defendants also argue that the jury's answers demonstrate it assessed liability without finding any intentional discriminatory conduct and therefore no award of punitive damages was warranted. That argument lacks sufficient merit to warrant extended discussion. R. 2:11-3(e)(1)(E). The jury explicitly concluded Kotecha created the hostile work environment and personally retaliated against plaintiff. As the Court noted in Tarr, supra, 181 N.J. at 80, 853 A.2d 921, "[a] cause of action asserting discrimination is willful rather than negligent."
Defendants also contend that plaintiff's appeal implicitly seeks to assail the jury's answer to question six as being against the weight of the evidence. That argument *249 also lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). Plaintiff does not ask us to overturn the verdict on the claim of intentional infliction of emotional distress; she only asks us to limit the import of the jury's answer to what was intendeda rejection of her common law claim.
As a result, we reverse the order denying reconsideration of the refusal to submit plaintiff's claim for punitive damages to the jury. The matter is remanded for a trial limited to that claim. We provide the following guidance in the event the case is actually tried again.
At oral argument before us, we solicited counsel's opinions regarding instructions to the second jury as to the findings of the jury in this trial. Both seemingly agreed that plaintiff must be permitted to provide the factual evidence supporting her claim for punitive damages. See, e.g., Ripa v. Owens-Corning Fiberglas Corp., 282 N.J.Super. 373, 394, 660 A.2d 521 (App. Div.) (noting that as to "a retrial only on punitive damages, . . . of necessity, there must be some recapitulation for the jury of the basis for both the compensatory and punitive damage awards"), certif. denied, 142 N.J. 518, 665 A.2d 1111 (1995). Both sides also agree that the second jury should be advised that its function is to determine only whether plaintiff was entitled to punitive damages, and if so, what amount.
Counsel for plaintiff indicated that a second jury should be told only that defendants violated the LAD and that plaintiff had proven compensatory damages; defendants believed that the second jury should also be told that plaintiff had not proven any emotional distress suffered as a result.
We can find few reported cases that squarely deal with the question. See, e.g., White v. Ford Motor Co., 500 F.3d 963, 974 (9th Cir.2007) (finding an abuse of discretion by the trial judge for failing to inform the jury on remand for punitive damages "the original jury's verdict and the amount of compensatory damages it awarded"); accord EEOC v. DCP Midstream, L.P., 603 F.Supp.2d 220, 223 (D.Me.2009) (determining that on remand for retrial on punitive damages, "the new jury [should be instructed] that a previous jury has found liability and the amounts that the plaintiffs have already recovered," thus placing "the second jury . . . in the same position the first jury occupied after delivering its verdict. . . ."); Nordyne, Inc. v. Fla. Mobile Home Supply, 625 So.2d 1283, 1289 (Fla.Dist.Ct.App.1993) (ordering the following preliminary instruction to be provided on re-trial: "Florida Mobile Home Supply has already received an award of compensatory damages for Nordyne's acts."); but cf., Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 601 A.2d 633, 659 (1992) (noting only that on re-trial "the trial court must properly instruct the jury as to the elements which must be shown by the plaintiffs [on their punitive damages claim] as well as to the standard of proof").
However, we take some guidance from the model jury charge which provides the following as part of its preliminary instructions in the usual, bifurcated trial:
The plaintiff is not entitled to punitive damages simply because you have found that the defendant has engaged in unlawful [discrimination/sexual harassment] or because you have awarded damages to compensate the plaintiff for [his/her] injury. You may award punitive damages to the plaintiff only if you find that plaintiff has proved certain additional matters that I will explain to you.
[Model Jury Charge (Civil), 8.61, "Punitive DamagesLaw Against Discrimination (LAD) Claims" (2009).]
*250 And this portion of the charge, dealing with the amount of punitive damages the jury may award:
I cannot provide you with any mathematical formula to calculate the amount of punitive damages, but the amount of punitive damages, if any, that you award must bear some reasonable relationship to the actual injury inflicted and the cause of the injury. You will have to use your sound discretion in deciding this issue.
[Ibid. (emphasis added).]
We conclude that in the event this matter is tried on plaintiff's punitive damages claim, the judge should instruct the jury that it has already been determined that defendants "engaged in unlawful [harassment]" and retaliation under the LAD, that plaintiff was awarded compensatory damages for her lost wages and back pay as a result, and provide the jury with the amount of the compensatory damage award.
We also direct that the second jury be told that it has been determined that plaintiff did not suffer emotional distress damages under the LAD. Although the second jury will be instructed that "[t]he purpose of punitive damages is different from the purpose of compensatory damages," ibid., this additional instruction will place the second jury in the approximate position of the first jury had it been permitted to consider plaintiff's punitive damages claim.
We also conclude this additional instruction is necessary to ensure fairness to defendants. Plaintiff's proofs in the punitive damages phase will necessarily repeat much of her testimony at the original trial that was intended to demonstrate not only violations of the LAD and her emotional distress damages, but also defendants' egregious conduct. The second jury must clearly understand, therefore, that it is not within its province to compensate plaintiff for emotional distress because that issue has already been decided. The sound exercise of the trial judge's discretion on retrial requires that any testimony regarding the emotional distress plaintiff allegedly suffered must be significantly limited, perhaps to a general statement, for example, that she was upset or offended by the conduct. Instructing the second jury that it has already been determined that plaintiff did not suffer emotional distress damages, combined with this evidentiary limitation, will focus the jury's attention only on those issues relevant to this phase of the trial.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] To the extent defendants contend that plaintiff's proofs were insufficient to support an award of punitive damages, we need not consider "whether there was contrary evidence; instead the focus [is] . . . on whether there was too little evidence of egregiousness presented by plaintiff to get to the jury on the issue at all." Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 276, 8 A.3d 209 (2010) (citing Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969)). Additionally, since defendants have not cross-appealed, any issues regarding the jury's finding that that they violated the LAD or its award of compensatory damages are not before us. R. 2:3-4(a); and see Pressler & Verniero, Current N.J. Court Rules, comment 2 on R. 2:3-4 (2011) ("Ordinarily, a respondent . . . must cross-appeal in order to obtain relief from the judgment.").
[2] Plaintiff's complaint misspelled Kotecha's surname as "Kotesha." Although we have adopted that spelling in the caption, we shall use the correct spelling throughout the course of this opinion.
[3] Testimony on defendants' case indicated that it was their intention to terminate plaintiff on the following Monday because of tardiness and other work related issues.
[4] The parties later reached an agreement "relating to taxes" and, by consent, increased the amount to $104,140.44.
[5] The caption of the order, dated September 30, indicates that plaintiff's motion was brought pursuant to Rule 4:49-2, though the body of the order notes that "[n]o timely post-trial motions [were made] pursuant to Rule 4:49-1." To the extent the judge determined plaintiff's motion for reconsideration was untimely, he was mistaken. First, from the colloquy that took place on the day the verdict was received, it was clearly understood that plaintiff would seek relief from the judge's ruling on her punitive damages claim and would also submit a request for counsel fees. Second, the "Order of Disposition" entered on the day of the verdict was not a final judgment and did not trigger the time constraints of Rule 4:49-2. See Pressler & Verniero, Current N.J. Court Rules, comment 1 on R. 4:49-2 (2011) ("The time prescription of th[e] rule applies only to final judgments and orders."). Lastly, plaintiff's motion was not a motion for a new trial pursuant to Rule 4:49-1.
[6] Although we note that pursuant to the PDA, a plaintiff must demonstrate by clear and convincing evidence that the defendant's "acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard." N.J.S.A. 2A: 15-5.12(a) (emphasis added).