71 A.3d 775

DOREEN LONGO, PLAINTIFF–RESPONDENT, v. PLEASURE PRO-
DUCTIONS, INC., INTERNATIONAL VIDEO DISTRIBUTORS,
L.L.C., FRANK KORETSKY, CHRISTOPHER J. CURYLO, MI-
CHAEL SAVAGE, DAVID ("BO") PEZZULLO, AND MARC KER-
CHEVAL, DEFENDANTS, AND EAST COAST NEWS CORP.,
DEFENDANT–APPELLANT.

Argued October 22, 2012—Decided July 24, 2013.

50

*Francis V. Cook* argued the cause for appellant (*Fox Roths-child,* attorneys; *Mr. Cook, Jonathan D. Weiner, Abbey True Harris,* and *Jonathan D. Ash,* on the briefs).

*Andrew W. Dwyer* argued the cause for respondent (*The Dwyer Law Firm,* attorneys; *Mr. Dwyer* and *La Toya L. Barrett,* on the brief).

Judge RODRÍGUEZ (temporarily assigned) delivered the opinion of the Court.

In this appeal, we address the adequacy of a jury instruction on punitive or exemplary damages in the context of a claim pursuant to the New Jersey Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19-1 to -8. Specifically, we address the necessity of an "upper management" jury instruction as defined in *Cavuoti v. New Jersey Transit Corp.,* 161 *N.J.* 107, 122-28, 735 *A.*2d 548 (1999), in order to sustain such an award. Our analysis leads to the conclusions that: (1) an upper management jury instruction was necessary in this case to support such an award; and (2) the same standard for awarding punitive damages that applies to claims pursuant to the Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49, applies to CEPA claims. There-

fore, we vacate the punitive damages award and remand for a new trial solely on such damages.

## I.

Plaintiff Doreen Longo sued her former employer, East Coast News Corp. (East Coast) and several former co-employees, some of whom could be part of East Coast's upper management echelon. Her complaint alleged that she was terminated from her position by East Coast management because she had complained of acts of sexual harassment and intimidation by former co-employee Marc Kercheval. East Coast answered the complaint and counter-claimed.

Longo testified that she was hired by East Coast in March 2002 to work in the sales department. Defendant David "Bo" Pezzullo was her direct supervisor. He reported to defendant Michael Savage, East Coast's general manager. East Coast is owned by two brothers, Frank and Michael Koretsky,[1] who are its co-presidents and owners of Pleasure Productions, Inc. (Pleasure Productions) and International Video Distributors, L.L.C. (International Video), which are involved in the adult entertainment business.

Longo and many of her co-workers attend annual shows at East Coast's New Jersey warehouse where individual buyers purchase adult products. At these shows, there are live performances of sexual acts to entertain the customers. At one show, Longo was shown photographs of Pezzullo receiving oral sex while at a company dinner. In a separate incident, Pezzullo exposed himself to her after taking an overdose of a drug used to promote an erection. Longo was not upset by the East Coast working environment. She "thought it was funny."

Kercheval began working with Longo in 2005 in the sales department. Initially, they had an amicable relationship. Howev-

---

[1] As used in this opinion, Koretsky refers to Frank Koretsky only.

er, a year later, their relationship deteriorated. Longo testified that Kercheval threatened to "knock everything off [her] desk" and sexually assault her. He suggested that Longo should trade sexual favors with a potential client in order to obtain new business. During an incident with another co-worker, Kercheval threw everything off his desk and threw a chair across the room. On another occasion, Kercheval put a fork to Longo's face and told her that he wanted to gouge out Pezzullo's eyes. Longo became "terrified" of Kercheval. She expressed her fear to Pezzullo several times. Nothing was done.

In January 2006, because Kercheval's aggression continued, Longo sent an e-mail to Pezzullo describing Kercheval's various outbursts of violent behavior. She requested Pezzullo, via e-mail, to "[p]lease help us." There was no response to this e-mail message.

On February 1, 2006, Longo wrote a second e-mail to Pezzullo, reiterating that Kercheval's behavior was continuing, and expressing her fear that "this is getting to be a dangerous situation." Longo sent a copy of the e-mail to General Manager Savage, with an explanation that she and Pezzullo had spoken to Kercheval, but the problems continued. There was no response to this second e-mail. She went to see Savage to make sure he received her e-mail. He acknowledged getting it but said he was busy at the moment.

One week later, Longo was called into a meeting with Kercheval, Koretsky, and Sue Glick, the head of Human Resources. Koretsky screamed expletives at Longo and Kercheval, and called them "idiots," "liars," and "lousy sales reps." He then said, "I don't need to put up with this [expletive] from either one of youse." On February 8, 2006, Kercheval and Longo received identical employee warning notices for poor sales and inappropriate remarks about East Coast and fellow employees. Kercheval signed the notice, and apologized for "any distress caused by [his] actions." Longo wrote a rebuttal stating that she was "hurt that she was receiving a warning notice in response for [her] reporting

to [her] manager Bo Pezzullo & General Manager Mike Savage a situation of Sexual Harassment & Hostile Work Environment." She said that she "never [made] and would never ma[k]e any disparaging remarks about the company."

A short time later, Kercheval was fired. Then, Longo was called into a meeting with Savage and Christopher J. Curylo, an in-house attorney for East Coast. Savage said, "Doreen, we really like you. You're a great sales rep, and I hate to do this, but I got to let you go." Savage then said, "your complaints about [Kercheval] caused a commotion and we like a nice, laid back environment around here."

Longo sued East Coast, its related companies Pleasure Productions and International Video, Koretsky, Curylo, Savage, Pezzullo, and Kercheval. The complaint initially alleged violations of CEPA and LAD. East Coast counterclaimed alleging that Longo had violated a non-competition and non-solicitation agreement. Prior to trial, Longo withdrew the LAD claim.

At trial, April Demarest testified on behalf of Longo. She related that her supervisor sexually harassed her immediately after she began working at East Coast in June 2002. She testified that after she complained to Pezzullo and Koretsky, she was transferred to another department. In late 2002, a dispute arose between Demarest and Savage. Demarest testified that when she went to meet with Savage in his office, he locked his door and told her "You know, if you'd sleep with me, things would go a lot smoother." She refused, and as she left the office, he told her "I'm going to make your life a living hell now." About eight months later, she gave a three-week resignation notice. Before the three weeks expired, she was fired.

At the close of Longo's case, the trial judge dismissed her complaint against Pleasure Productions, International Video, Curylo, and Kercheval. The judge also dismissed East Coast's counterclaim. The jury returned a no-cause verdict in favor of Savage and Pezzullo but found East Coast and Koretsky in his

individual capacity liable to Longo in the amount of $120,000 for economic loss and $30,000 in emotional distress damages.

A second phase of trial began to consider punitive damages against East Coast only. During the punitive damages phase, Longo's counsel argued to the jury:

East Coast News operates not just through Frank Koretsky. It operates through all of its employees and it is responsible for the behavior of all of its employees.... East Coast News is also responsible for the behavior of Pezzullo and it's also responsible for the behavior of Savage. In each case you have people who recklessly disregarded the plaintiff's rights. When Savage got his complaint, he said I just didn't believe it. I didn't even talk to her, I didn't even talk to other witnesses. I didn't do anything.... And Bo Pezzullo, Bo Pezzullo let's face it, the evidence on Bo Pezzullo shows that he came into this courtroom and he lied to you. He lied to you over and over again about what he did, about what the other witnesses told him, about his alleged investigation, where his investigative notes somehow disappeared. So Bo Pezzullo's behavior was totally outrageous and quite frankly his coming into this courtroom and lying to you about it is, itself, evidence of malice and evidence of reckless disregard for the plaintiff's rights. So you have abundant evidence to assign punitive damages against East Coast News.

The judge charged the jury that it could only award punitive damages "to punish defendants who have acted in an especially egregious or outrageous manner and to discourage the defendants from engaging in similar misconduct in the future." The judge noted that Longo could only recover punitive damages if she proved "she is entitled to them by clear and convincing evidence." The judge further instructed that "especially egregious behavior" is behavior that is "motivated either by actual malice or that was done with a willful and wanton disregard of the rights of the plaintiff."

East Coast objected to this jury charge arguing that: (1) the charge did not contain the definition of upper management; (2) the charge was silent on the issue of finding that upper management participated in or had been willfully indifferent to the retaliatory conduct against Longo; and (3) although Koretsky was found liable in an individual capacity for compensatory damages pursuant to a preponderance of the evidence standard, the jury was not instructed that in determining punitive damages against East Coast, the jury had to weigh Koretsky's involvement in the

retaliatory conduct against Longo against the clear and convincing evidence standard. The judge did not reinstruct the jury as requested by East Coast. The jury awarded Longo $500,000 in punitive damages to be paid by East Coast.

## II.

East Coast appealed and the Appellate Division panel affirmed the compensatory damages award. A majority of the panel also affirmed the punitive damages award. Citing *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 625, 626 *A.*2d 445 (1993), and *Cavuoti, supra,* 161 *N.J.* at 117, 735 *A.*2d 548, the majority held that in order for an employer to be liable for punitive damages, it is only necessary that there be "some" involvement by the employer's upper management. *Longo v. Pleasure Prod., Inc.,* No. A–3872–09T2, slip op. at 21, 2011 *WL* 3557518 (App.Div. Aug. 15, 2011).

However, a dissenting judge voted to reverse. The dissenter concluded the punitive damages award could not stand "in the face of the trial court's failure to give an instruction to the jury that a necessary precondition to an award of punitive damages was a finding that upper management had either actively participated in or been willfully indifferent to the violation of plaintiff's rights." *Id.* at 1–2 (Wefing, J., dissenting). The dissenter noted that the majority was disregarding prior opinions of this Court. *Ibid.*

## III.

East Coast appealed to this Court as of right based on the dissent, *R.* 2:2–1(a)(2), and moved for a stay, which we granted. East Coast contends that the jury was not properly instructed on the requirement of participation or willful indifference by upper management in order to award punitive damages as required by *Lehmann, supra,* which held that punitive damages can only be awarded when there is actual participation or willful indifference by upper management. 132 *N.J.* at 625, 626 *A.*2d 445. East Coast also contends that the *Lehmann* standard is applicable to CEPA claims. *See Abbamont v. Piscataway Twp. Bd. of Educ.,*

138 *N.J.* 405, 419, 650 *A.*2d 958 (1994) (applying *Lehmann* standard to CEPA action); *accord Quinlan v. Curtiss–Wright Corp.,* 204 *N.J.* 239, 274, 8 *A.*3d 209 (2010); *Cavuoti, supra,* 161 *N.J.* at 113–14, 735 *A.*2d 548.

East Coast argues that by its verdict the jury "exonerated" Koretsky from liability for punitive damages and found that no one from East Coast's upper management was involved in the retaliatory firing. Thus, the jury improperly considered the conduct of individuals outside of upper management in awarding punitive damages.

East Coast also argues that the circumstances in this case are most similar to *Lockley v. Department of Corrections,* 177 *N.J.* 413, 424, 828 *A.*2d 869 (2003), in which this Court reversed a punitive damages award because there was an improper jury instruction on upper management involvement.

East Coast further argues the jury charge given at this trial incorrectly defined the standard of proof because it did not advise the jury that an award of punitive damages is appropriate only if there is clear and convincing evidence to support it. Longo responds that no specific jury instruction on upper management was needed because Koretsky was found individually liable for compensatory damages, and by virtue of his position as co-president, he is clearly part of upper management.

## IV.

A review of existing authority indicates that CEPA provides that a prevailing plaintiff in a CEPA action is entitled to "[a]ll remedies available in common law tort actions." *N.J.S.A.* 34:19–5. The statute specifically permits compensatory and punitive damages. *Ibid.; see also Green v. Jersey City Bd. of Educ.,* 177 *N.J.* 434, 443, 828 *A.*2d 883 (2003) (recognizing that CEPA permits award of punitive damages).

Punitive damages are awarded to ensure "deterrence of egregious misconduct and the punishment of the offender." *Her-*

*man v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 337, 627 *A.*2d 1081 (1993); *Quinlan, supra,* 204 *N.J.* at 273, 8 *A.*3d 209. The Punitive Damages Act, *N.J.S.A.* 2A:15–5.9 to –5.17, permits such damages only if

> [t]he plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. The burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
>
> [*N.J.S.A.* 2A:15–5.12.]

" '[P]unitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial.' " *Rusak v. Ryan Auto., L.L.C.,* 418 *N.J.Super.* 107, 118, 12 *A.*3d 239 (App. Div.2011) (quoting *N.J.S.A.* 2A:15–5.13(c)).

In CEPA claims, in addition to these statutory requirements, there is an additional restriction: punitive damages are available against an employer only if there is " 'actual participation by upper management or willful indifference.' " *Abbamont, supra,* 138 *N.J.* at 419, 650 *A.*2d 958 (quoting *Lehmann, supra,* 132 *N.J.* at 625, 626 *A.*2d 445). In *Abbamont,* although there was an even split of the members of this Court on some issues, all agreed on the requirement of actual participation by upper management in the unlawful conduct. *Ibid.*

In *Abbamont, supra,* this Court, analogizing to the rules of employer liability in the LAD context established by *Lehmann,* stated that based on the doctrine of respondeat superior and considerations of public policy, both compensatory and punitive damages could be awarded against an employer for the actions of its employees in CEPA cases. 138 *N.J.* at 415–18, 650 *A.*2d 958. The Court noted, however, that "[a] greater threshold than mere negligence should be applied to measure employer liability for punitive damages; they are to be awarded when the wrongdoer's conduct is especially egregious but only in the event of actual participation by upper management or willful indifference." *Id.* at 419, 650 *A.*2d 958 (quoting *Abbamont v. Piscataway Twp. Bd. of*

*Educ.,* 269 *N.J.Super.* 11, 31, 634 *A.2d* 538 (App.Div.1993)) (quoting *Lehmann, supra,* 132 *N.J.* at 624–25, 626 *A.2d* 445). Both concepts—"especially egregious behavior" and "upper management"—have been explained by this Court.

In *Quinlan, supra,* we recognized that "the concept of egregiousness does not lend itself to neat or precise definitions"; nonetheless we provided as follows:

We have described the test for egregiousness as being satisfied if plaintiff has proven "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard for the rights of [plaintiff]." In the alternative, we have found that the evidence will suffice if it demonstrates that defendant acted with "actual malice."

[204 *N.J.* at 274, 8 *A.3d* 209 (citing *Rendine v. Pantzer,* 141 *N.J.* 292, 314, 661 *A.2d* 1202 (1995)) (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49, 477 *A.2d* 1224 (1984)).]

█ The standard definition of "upper management" was laid out by this Court in *Cavuoti.* There, we held that identifying "upper management" is a "fact-sensitive" task. *Cavuoti, supra,* 161 *N.J.* at 122, 735 *A.2d* 548. Acknowledging that "[a]t the margins, defining 'upper management' is easy,"—the chief executive officer is clearly upper management, while an assembly line worker is not—we recognized the extensive gray area between the margins. *Ibid.* After thorough discussion of both federal and state cases, *id.* at 122–28, 735 *A.2d* 548, this Court determined that the central principle should be that "[i]n order to justify the imposition of punitive damages on an employer, the employees who acted wrongfully must have had sufficient authority to make the imposition of punitive damages fair and reasonable." *Id.* at 128, 735 *A.2d* 548. In order to be a part of "upper management," "the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace." *Id.* at 129, 735 *A.2d* 548; *accord Kluczyk v. Tropicana Prods., Inc.,* 368 *N.J.Super.* 479, 496, 847 *A.2d* 23 (App.Div.2004) ("[M]embers of upper management are not limited to the chief executive officer, chief operating officer or a member

of the board. The issue is fact sensitive." (quotation marks omitted)).

As for the appropriate remedy when the definition of "upper management" is omitted from a jury charge, we have already addressed the issue in *Baker v. National State Bank*, 161 *N.J.* 220, 223, 736 *A.*2d 462 (1999), *Mogull v. CB Commercial Real Estate Group, Inc.*, 162 *N.J.* 449, 475, 744 *A.*2d 1186 (2000), and *Lockley, supra*, 177 *N.J.* at 424–26, 828 *A.*2d 869. Although these three cases arise in the context of LAD claims, the principle announced applies in the CEPA context also.

In *Baker, supra*, the claimants were improperly terminated from their employment at a bank due to age and gender discrimination. 161 *N.J.* at 223–24, 736 *A.*2d 462. They sued their employer, alleging that individual defendants, the Senior Vice–President in Charge of Branch Operations and the Regional Manager, had improperly terminated their employment. *Ibid.* The trial court did not give the upper management jury instruction. *Id.* at 225, 736 *A.*2d 462. Defense counsel did not object to the charge, *id.* at 223, 736 *A.*2d 462, and the jury awarded punitive damages against the bank, *ibid.*

On appeal from the Appellate Division's affirmance, we began our analysis by noting that trial courts must give an upper management charge during the punitive damages stage of the trial. *Id.* at 223, 736 *A.*2d 462. We also noted that

> this concept is so essential to a fair trial that "the failure to charge the jury with the necessity of finding upper management's involvement to justify a punitive award is such a fundamental flaw that [an appellate court] must recognize it as a matter of plain error."
>
> [*Id.* at 225–26, 736 *A.*2d 462 (quoting *Maiorino v. Schering–Plough Corp.*, 302 *N.J.Super.* 323, 354, 695 *A.*2d 353 (App.Div.), *certif. denied*, 152 *N.J.* 189, 704 *A.*2d 19 (1997)).]

Applying this standard, we concluded that "because wrongful conduct was committed by employees who were so clearly members of upper management, the error could not have produced an unjust result." *Id.* at 223, 736 *A.*2d 462. Noting that the individual defendants were the "sole actors in the conduct," we also conclud-

ed that there was no error because they were "top management of the bank," and therefore "indisputably upper management." *Id.* at 226, 736 *A.*2d 462 (citing *Kolstad v. Am. Dental Ass'n,* 527 *U.S.* 526, 543, 119 *S.Ct.* 2118, 2128, 144 *L.Ed.*2d 494, 510 (1999)).

In *Mogull, supra,* the claimant filed a LAD claim against her employer and several former co-employees alleging that she had been the victim of discrimination based on her gender. 162 *N.J.* at 452–58, 744 *A.*2d 1186. "Without objection, the trial court submitted the case to the jury without a specific instruction that jurors were required to find that upper management had actually participated in, or been willfully indifferent to, the wrongful conduct." *Id.* at 474, 744 *A.*2d 1186.

The jury returned a verdict in favor of Mogull in the amount of $1.5 million in compensatory damages and $5 million in punitive damages. *Id.* at 459–60, 744 *A.*2d 1186. The employer appealed. *Id.* at 460, 744 *A.*2d 1186. The Appellate Division reversed the punitive damages verdict due to the failure of the trial court to give the upper management charge. *Id.* at 461, 744 *A.*2d 1186. This Court affirmed, noting that "[s]uch a charge is particularly important when the wrongful conduct, as here, was committed allegedly by many different employees, with varying titles [and job responsibilities] . . . ." *Id.* at 474, 744 *A.*2d 1186. Because the defendant had not objected to this jury charge at trial, the Court remanded for consideration of whether the omission of this charge "was clearly capable of producing an unjust result." *Id.* at 475, 744 *A.*2d 1186.

In *Lockley, supra,* the claimant, a corrections officer with the New Jersey Department of Corrections (DOC), pursued a LAD claim, alleging that he had been sexually harassed by a co-worker and he was retaliated against when he complained about such conduct. 177 *N.J.* at 416–18, 828 *A.*2d 869. The jury awarded Lockley $750,000 in compensatory damages. *Id.* at 419, 828 *A.*2d 869. During the punitive damages stage, "the trial court simply instructed the jury to consider 'whether upper management had been involved' and gave no further guidance." *Id.* at 425, 828 *A.*2d

869 (quoting *Lockley v. Dep't of Corr.*, 344 *N.J.Super.* 1, 20, 779 *A.*2d 1092 (App.Div.2001)). The jury awarded $3 million in punitive damages. *Id.* at 420, 828 *A.*2d 869.

The employer appealed. *Ibid.* The Appellate Division affirmed the compensatory damages award but reversed the punitive damages award. *Id.* at 421, 828 *A.*2d 869. This Court affirmed the Appellate Division's reversal, concluding that the omissions in the jury charge were fatal. *Ibid.*

We noted that Lockley alleged that he had been harassed by lower-level employees, and his supervisors had failed to respond appropriately. *Id.* at 425, 828 *A.*2d 869. The DOC alleged that the upper-level employees had responded appropriately. *Ibid.* We concluded that

[i]t is unlikely that every employee within the DOC command structure had the authority to take remedial action in this case; it is also unlikely that, without instruction from the trial court, the jury examined the duties, responsibilities, and powers of each of the DOC employees whose conduct or willful indifference affected Lockley to determine whether they were part of the DOC's upper management.

[*Id.* at 425–26, 828 *A.*2d 869.]

The Appellate Division also addressed the remedy in *Maiorino, supra*, 302 *N.J.Super.* at 354, 695 *A.*2d 353, when it reversed an award of punitive damages in a LAD case because the trial court had not given an upper management instruction, although the defendant did not object at trial. The plaintiff in *Maiorino* alleged that he had been terminated from his job by his manager, who was the company's district sales manager, in violation of the LAD. *Id.* at 338, 695 *A.*2d 353. The appellate panel held "the trial court committed plain error when it failed to instruct the jury that [the defendant-employer's] upper management had to be involved in the termination of Maiorino in order to award punitive damages against it." *Ibid.* The panel held that, under these circumstances, it was "legally incorrect" for the trial court to fail to "properly instruct the jury that in order for punitive damages to be warranted against [the defendant], it had to find that [the defendant's] upper management actually participated in or was willfully indif-

ferent to the wrongful discriminatory conduct." *Id.* at 355, 695 A.2d 353; *contra Kluczyk, supra,* 368 *N.J.Super.* at 497–98, 847 A.2d 23 (upholding punitive damage award in LAD case where "upper management" charge was properly given).

Thus, we glean the following principles governing jury instruction on punitive damages. In CEPA claims similar to LAD claims, the failure to charge the jury with an upper management instruction is considered to be "a fundamental flaw." *Baker, supra,* 161 *N.J.* at 226, 736 A.2d 462. Based on the doctrine of respondeat superior, punitive damages can only be awarded against an employer for the actions of its upper management employees. *Abbamont, supra,* 138 *N.J.* at 415–18, 650 A.2d 958. The jury must determine whether the wrongful conduct was committed by employees who were clearly members of upper management. *Baker, supra,* 161 *N.J.* at 223, 736 A.2d 462. Additionally, more than mere negligence by the employees must be shown. Rather, punitive damages are to be awarded when the upper management employee's conduct is "especially egregious." *Abbamont, supra,* 138 *N.J.* at 419, 650 A.2d 958. The conduct by upper management employees must constitute actual participation or willful indifference to the claimant's rights. *Lehmann, supra,* 132 *N.J.* at 625, 626 A.2d 445. Any uncertainty about the roles and responsibilities of the upper management employees who committed the wrongful conduct must be decided as a matter of fact by the jury. *See Lockley, supra,* 177 *N.J.* at 425, 828 A.2d 869; *Mogull, supra,* 162 *N.J.* at 474–75, 744 A.2d 1186; *Maiorino, supra,* 302 *N.J.Super.* at 355, 695 A.2d 353. The upper management charge is especially important when the wrongful conduct was allegedly committed by different employees. The jury must determine which employees are part of upper management. *Mogull, supra,* 162 *N.J.* at 474, 744 A.2d 1186.

## V.

Here, the jury instructions were flawed because the jury heard no upper management charges at all. Therefore, it was

never instructed that only the conduct of upper management employees could be considered in awarding punitive damages. Nor was the jury advised of the standard of conduct that would warrant a punitive damages award. This lack of guidance could have resulted in an unjust result. For example, if the jury found that the conduct of Kercheval (who was clearly not an upper management employee) was especially egregious, it might have improperly awarded punitive damages against East Coast. That is exacerbated by Longo's counsel's argument to the jury that the conduct of any East Coast employees could be the basis for the award of punitive damages. Counsel also argued that the conduct of Pezzullo and Savage was a basis for imposing punitive damages on East Coast. But, without first finding that Pezzullo or Savage were upper management, their conduct could not be considered by the jury.

There is another flaw in the verdict due to lack of a proper instruction. Koretsky was found individually liable for wrongful and retaliatory termination during the compensatory damages stage of the trial. The jury made this finding according to the "preponderance of the evidence standard." *See Donofry v. Autotote Sys., Inc.,* 350 *N.J.Super.* 276, 293, 795 *A.2d* 260 (App. Div.2001) (holding that in CEPA claim, plaintiff has "the burden of proof that the adverse employment action was caused by purposeful or intentional [retaliation] ... by a preponderance of the evidence"). However, punitive damages can only be awarded if the jury finds wrongful conduct by applying the "clear and convincing evidence" standard, *N.J.S.A.* 2A:15-5.12. Thus, although the jury found Koretsky individually liable at the first stage of trial, it was not instructed to assess his involvement under the higher standard of proof needed to award punitive damages.

These errors can only be cured by a new trial. Therefore, because the jury was not given an upper management charge, with a concomitant instruction emphasizing that its findings on punitive damages had to be made pursuant to the clear and convincing

standard, rather than by preponderance of the evidence as in the first trial, we must reverse.

## VI.

The judgment of the Appellate Division is reversed, the award of punitive damages is vacated, and the matter is remanded to the Law Division for a new trial solely on that issue.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—7.

*Opposed*—None.